# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI

BACKPAGE.COM, LLC,    )
           )
   Plaintiff,     )
           )  Case No. 4:17-cv-01951
v.           )
           )
JOSHUA D. HAWLEY    )
           )
   Defendant.    )

# MEMORANDUM IN OPPOSITION TO SECOND
# MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...........................................................................................iii

INTRODUCTION .................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 4

ARGUMENT............................................................................................................ 8

    I.     Backpage Fundamentally Misreads the Regulation. ..................................... 9

         A.     The regulation concerns illegal prostitution and penalizes not the advertising of illegal prostitution, but lying about or concealing that act. ........................................................................... 10

         B.     The regulation includes a scienter element. ..................................... 14

    II.    This Court has no subject-matter jurisdiction because Backpage's claims are unripe. ......................................................................................... 16

    III.   Backpage Cannot Establish Likelihood of Success on the Merits. ............. 19

         A.     The CDA does not preempt the regulation. ..................................... 20

         B.     The regulation satisfies the requirements of the First Amendment. .................................................................................... 25

         C.     The regulation is not void for vagueness. ....................................... 32

         D.     Establishing doubt as to the regulation's meaning would require *Pullman* abstention, not show likelihood of success on the merits. ................................................................................... 35

    IV.   The Balancing of Harms and the Public Interest Oppose Granting Preliminary Injunctive Relief. ................................................................... 37

i

CONCLUSION ............................................................................................................. 39

CERTIFICATE OF SERVICE.......................................................................................... 40

# TABLE OF AUTHORITIES

**CASES**

*1-800-411-Pain Referral Serv., LLC v. Otto*,

    744 F.3d 1045 (8th Cir. 2014) ........................................................................*passim*

*Arizona v. United States*,

    567 U.S. 387 (2012) ............................................................... 27, 28, 29, 30

*Arnzen v. Palmer*,

    713 F.3d 369 (8th Cir. 2013) ................................................................ 14

*Babbitt v. Farm Workers*,

    442 U.S. 289 (1979) ........................................................................... 25

*Backpage.com, LLC v. Cooper*,

    939 F. Supp. 2d 805 (M.D. Tenn. 2013) ................................................ 19

*Backpage.com, LLC v. Hoffman*,

    2013 WL 4502097 (D.N.J. Aug. 20, 2013) ........................................... 19

*Backpage.com, LLC v. McKenna*,

    881 F. Supp. 2d 1262 (W.D. Wash. 2012) ........................................... 19

*Baggett v. Bullitt*,

    377 U.S. 360 (1964) ........................................................................... 42

*Boutilier v. Immigration & Naturalization Serv.*,

    387 U.S. 118 (1967) ........................................................................... 39

*Boyce Motor Lines v. United States*,

    342 U.S. 337 (1951) ......................................................................... 39

*Broadrick v. Oklahoma*,

    413 U.S. 601 (1973) .................................................................*passim*

*Burris v. Cobb*,

    808 F.3d 386 (8th Cir. 2015) ........................................................ 42

*Chance Mgmt., Inc. v. South Dakota*,

    97 F.3d 1107 (8th Cir. 1996) ........................................................ 37

*Citizens United v. Fed. Election Comm'n*,

    558 U.S. 310 (2010) ....................................................................... 36

*Coalition for Economic Equity v. Wilson*,

    122 F.3d 718 (9th Cir. 1997) ....................................................... 43

*Earth Island Inst. v. Union Elec. C*o.,

    456 S.W.3d 27 (Mo. 2015) ........................................................... 18

*Excalibur Grp., Inc. v. City of Minneapolis*,

    116 F.3d 1216 (8th Cir. 1997) ..................................................... 34

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,

    521 F.3d 1157 (9th Cir. 2008) ............................................... 27, 30

*FCC v. Beach Communications, Inc*.,

    508 U.S. 307 (1993) ....................................................................... 37

*Giboney v. Empire Storage & Ice Co*.,

    336 U.S. 490 (1949) ....................................................................... 32

*Harris v. Quinn*,

    134 S. Ct. 2618 (2014) ........................................................................ 36

*Jama v. Immigration & Customs, Enf't*,

    543 U.S. 335 (2005) .......................................................................... 22

*Johnson v. MFA Petroleum Co.*,

    701 F.3d 243 (8th Cir. 2012) ............................................................. 28

*Johnson v. United States*,

    135 S. Ct. 2551 (2015) ........................................................................ 39

*Kennedy v. Ferguson*,

    679 F.3d 998 (8th Cir. 2012) ............................................................. 22

*Koscielski v. City of Minneapolis*,

    435 F.3d 898 (8th Cir. 2006) ............................................................. 37

*Lime & Avocado Growers, Inc. v. Paul*,

    373 U.S. 132 (1963) ...................................................................... 28, 37

*Longshoremen's Union v. Boyd*,

    347 U.S. 222 (1954) .......................................................................... 25

*Maryland v. King*,

    567 U.S. 1301 (2012) ........................................................................ 43

*Mazurek v. Armstrong*,

    520 U.S. 968 (1997) .......................................................................... 15

*Milavetz, Gallop & Milavetz, P.A. v. United States*,

    559 U.S. 229 (2010) .......................................................................... 36

v

*Moe v. Brookings Cty.*,

    659 F.2d 880 (8th Cir. 1981) ................................................................................ 42

*Musser v. Mapes*,

    718 F.3d 996 (8th Cir. 2013) ............................................................................... 33

*Neb. Pub. Power Dist. v. MidAmerican Energy Co.*,

    234 F.3d 1032 (8th Cir. 2000) ..................................................................... 23, 24

*New Motor Vehicle Bd. of Calif. v. Orrin W. Fox Co.*,

    434 U.S. 1345 (1977) ............................................................................................ 43

*New York v. Ferber*,

    458 U.S. 747 (1982) .............................................................................................. 34

*Nken v. Holder*,

    556 U.S. 418 (2009) .............................................................................................. 44

*North Dakota v. Heydinger*,

    825 F.3d 912 (8th Cir. 2016) ............................................................................... 18

*Northcross v. Bd. of Ed. of Memphis City Sch.*,

    412 U.S. 427 (1973) .............................................................................................. 17

*Parrish v. Dayton*,

    761 F.3d 873 (8th Cir. 2014) ............................................................................... 23

*Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*,

    734 F.3d 406 (5th Cir. 2013) ............................................................................... 43

*Plubell v. Merck & Co.*,

    289 S.W.3d 707 (Mo. Ct. App. 2009) ................................................................. 20

*Plumley v. Com. of Mass.*,

    155 U.S. 461 (1894) ............................................................................. 28

*R.J. Reynolds Tobacco Co. v. FDA*,

    696 F.3d 1205 (D.C. Cir. 2012) .......................................................... 37

*Railroad Commission v. Pullman Co.*,

    312 U.S. 496 (1941) ............................................................................. 41

*Renne v. Geary*,

    501 U.S. 312 (1991) ....................................................................... 24, 25

*Rice v. Santa Fe Elevator Corp.*,

    331 U.S. 218 (1947) ............................................................................. 27

*Rose v. Locke*,

    423 U.S. 48 (1975) ............................................................................... 39

*Russello v. United States*,

    464 U.S. 16 (1983) ............................................................................... 22

*Siepel v. Bank of Am., N.A.*,

    239 F.R.D. 558 (E.D. Mo. 2006) ........................................................ 21

*State ex rel. Nixon v. Beer Nuts, Ltd.*,

    29 S.W.3d 828 (Mo. Ct. App. 2000) .................................................. 44

*State v. Mahurin*,

    799 S.W.2d 840 (Mo. 1990) ............................................................... 33

*State v. Shaw*,

    847 S.W.2d 768 (Mo. 1993) ......................................................... 21, 41

vii

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,

    1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) .................................................. 29

*TCF Nat. Bank v. Bernanke*,

    643 F.3d 1158 (8th Cir. 2011) ......................................................................... 14, 43

*Texas v. United States*,

    523 U.S. 296 (1998) ................................................................................................ 23

*Thomas v. Anchorage Equal Rights Comm'n*,

    220 F.3d 1134 (9th Cir. 2000) ............................................................................... 22

*Townley v. Miller*,

    722 F.3d 1128 (9th Cir. 2013) ............................................................................... 23

*United States v. Arnaout*,

    431 F.3d 994 (7th Cir. 2005) ........................................................................... 35, 40

*United States v. Awan*,

    607 F.3d 306 (2d Cir. 2010) ................................................................................... 35

*United States v. Gater*,

    868 F.3d 657 (8th Cir. 2017) ................................................................................. 37

*United States v. Mandhai*,

    375 F.3d 1243 (11th Cir. 2004) ............................................................................. 35

*United States v. Salerno*,

    481 U.S. 739 (1987) ......................................................................................... 26, 33

*United States v. United Foods, Inc.*,

    533 U.S. 405 (2001) ............................................................................................... 36

*United States v. Williams*,

    553 U.S. 285 (2008) ................................................................................ 32, 33

*Vill. of Hoffman Estates v. Flipside Hoffman Estates, Inc*,

    455 U.S. 489 (1982) ............................................................................ 39, 40, 41

*Virginia v. American Booksellers Ass'n*,

    484 U.S. 383 (1988) ...................................................................................... 18

*Virginian Ry. Co. v. Sys. Fed'n No. 40*,

    300 U.S. 515 (1937) ...................................................................................... 44

*Watt v. GMAC Mortg. Corp.*,

    457 F.3d 781 (8th Cir. 2006) ........................................................................ 22

*Ways v. City of Lincoln*,

    274 F.3d 514 (8th Cir. 2001) ........................................................................ 34

*Weed v. Jenkins*,

    873 F.3d 1023 (8th Cir. 2017) ...................................................................... 40

*Wersal v. Sexton*,

    674 F.3d 1010 (8th Cir. 2012) ...................................................................... 23

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,

    471 U.S. 626 (1985) .......................................................................... 25, 37, 38, 43

**STATUTES**

21 U.S.C. § 343-1 ................................................................................................ 31

47 U.S.C. § 230(c) .............................................................................................. 11

47 U.S.C. § 230(c)(1) ........................................................................................ 27

47 U.S.C. § 230(c)(1), (f)(3) ............................................................................. 27

47 U.S.C. § 230(e)(3) ........................................................................................ 28

Mo. Rev. Stat. § 566.010(3), (5), (6), (7) ......................................................... 14

Mo. Rev. Stat. § 407.020 ............................................................................ *passim*

Mo. Rev. State § 407.040 .................................................................................. 12

Mo. Rev. Stat. § 407.145 ................................................................................... 12

Mo. Rev. Stat. § 407.569 ................................................................................... 22

Mo. Rev. Stat. § 407.589.1 ............................................................................... 22

Mo. Rev. Stat. § 566.010 ............................................................................. 14, 17

Mo. Rev. Stat. § 567.010(4), (7) ....................................................................... 17

Mo. Rev. Stat. § 567.020.1 ............................................................................... 17

**REGULATIONS**

79 Fed. Reg. 71,156 (Dec. 1, 2014) ................................................................. 31

## INTRODUCTION

Basic, venerated principles of fair business practices hold that consumers deserve to know the nature of the companies with which they transact business. Backpage may passively permit third parties to post illegal content to its site consistent with the Communications Decency Act. But Backpage is not entitled to lie about that practice. Nor may Backpage conceal from consumers any illegal practices it undertakes outside the scope of the CDA, such as its practice of creating first-party illegal content that advertises for human trafficking. When Backpage conceals those forms of information from consumers, it engages in a large-scale scheme of deception. Missouri consumer protection laws guard consumers from these forms of deception. In particular, the provision Backpage challenges requires a person who "advertises, sells, offers, or provides any merchandise that constitutes or involves" illegal prostitution to disclose to consumers that the person does so. 15 CSR 60-16.040.

Backpage challenges that provision, asserting that it is overbroad and vague and imposes liability on a substantial amount of protected conduct. But instead of waiting to see whether a concrete enforcement proceeding will commence, Backpage challenges the facial validity of the regulation under the Communications Decency Act and the First Amendment. Yet Backpage can succeed on a facial challenge only if Backpage establishes that the regulation can never be applied lawfully. Backpage cannot hope to meet that burden because the regulation covers conduct clearly outside the scope of either provision. Backpage's attempt to purge any regulations that might hypothetically apply to Backpage fails.

1

First, Backpage bases its argument on an unsound foundation. Backpage asserts that the regulation applies to any non-commercial activity tangentially related to sex, but that assertion is premised on a deeply flawed interpretation of the regulation. Backpage purports to define the term "commercial sexual conduct" according to the regulation. Backpage, however, uses an ellipsis to omit that the regulation expressly incorporates definitions from other provisions of law. Only by disregarding those definitions entirely is Backpage able to broadly construe the interpretation. Properly construed, the definitions provision reveals that the regulation targets advertisements or sales of illegal prostitution.

Similarly, Backpage's argument that the government may impose liability under the regulation without proving a scienter element lacks merit. Backpage acknowledges that the statute that imposes liability, section 407.020, includes scienter elements. Backpage asserts that the clarifying regulation must also repeat that scienter element, but Backpage is unable to provide any authority for that assertion.

Second, Backpage's pre-enforcement, facial challenge is unripe, so this Court has no subject-matter jurisdiction. To establish ripeness, a plaintiff must establish an immediate, concrete plan to engage in conduct that violates the regulation. Yet Backpage asserts that it never knowingly advertises illegal prostitution. Backpage maintains that it removes all advertisements for illegal prostitution to the extent Backpage is aware of the illegal nature of those advertisements. Because Backpage has not established that it ever knowingly permits advertisements for illegal prostitution, it has not established that it has taken action covered by the regulation. Backpage therefore cannot establish anything more than a "hypothetical" case.

2

Third, Backpage has not established likelihood of success on the merits. The CDA does not preempt the regulation. The CDA does not even apply to the countless persons who engage in commerce without using Internet forums, so Backpage's facial challenge fails. The regulation, moreover, does not impose liability for passively permitting third-parties to post illegal advertisements—conduct the CDA protects. It instead imposes liability for *lying* about doing so or for concealing other important information from consumers. Backpage also cannot establish preemption without identifying a clear statement by Congress establishing that Congress intended to supersede the historic police power of states to prevent consumer deception. Backpage has made no attempt to identify any relevant statement.

The regulation also does not violate the First Amendment. The regulation targets only speech advertising illegal prostitution, which is categorically unprotected. Backpage argues that the regulation is overbroad. That argument fails for many reasons: the doctrine applies only to protected speech, not the illegal advertisements; Backpage's argument rests on an unjustified misinterpretation of the regulation; and even if some broad interpretations of the regulation exist, Backpage has failed to establish substantial overbreadth.

Nor do the disclosure provisions run afoul of the First Amendment. The challenged provision requires disclosures of commercial speech, which is reviewed at a level of scrutiny "akin to rational-basis review." Requiring persons to disclose whether they sell or advertise products that include illegal prostitution is rationally related to preventing misleading consumers by omission.

3

The regulation also is not void for vagueness because the terms are not "so vague and indefinite as really to be no rule or standard at all." Backpage identifies some hypothetically broad applications of the regulation, but Backpage is unable to establish anything more than what the Supreme Court has consistently acknowledged: all language may appear vague in at least some circumstances, and regulations need not be drafted with perfect specificity.

Even if Backpage could establish substantial uncertainty about the regulation, Backpage's argument would merely justify abstaining under the *Pullman* doctrine, which applies where interpretation of an unclear state provision could avoid or materially alter constitutional issues. Backpage's entire argument rests on its erroneous interpretation of a state provision. A clarifying interpretation by state courts would likely remove any constitutional issues.

Fourth, preliminary injunctive relief is also unwarranted because Backpage has established no irreparable harm. Backpage does not even contend that it takes action covered by the regulation. And the harm to the government and the public interest would be substantial because it would prohibit enforcement of a democratically enacted statute.

## FACTUAL BACKGROUND

Backpage has acquired a notorious reputation for its association with human trafficking. "Backpage is involved in 73% of all child trafficking reports that the National Center for Missing and Exploited Children (NCMEC) receives from the general public." U.S. Senate, Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs, *Backpage.com's Knowing Facilitation of Online Sex*

*Trafficking*, Doc. 21-8, at 65. "The National Association of Attorneys General has aptly described Backpage as a 'hub' of 'human trafficking, especially the trafficking of minors.'" *Id.* Revenue from that human trafficking makes up a substantial portion of the nearly $3 million Backpage garners each week. Doc. 21-9, at 11-12.

For years, "Backpage represented to the public and the courts that it merely hosted content others had created." Doc. 21-8, at 65. The Communications Decency Act protects Internet forum providers from liability for third-party content posted to their forums, 47 U.S.C. § 230(c), and Backpage asserted that it bore no responsibility for what others did with its website. Backpage maintains that position now. But its façade has crumbled.

Recent, explosive evidence tells a starkly different story. Instead of passively permitting third parties to post ads for illegal human trafficking, Backpage has implemented a sophisticated, wide-ranging scheme through which the company identified posts involving patently illegal commercial sex, including sexual exploitation of minors. Backpage scrubbed from ads key buzzwords that indicated that a victim was underage, such as "teenage," "rape," "little girl," "Lolita," "fresh," "school girl," and "Amber Alert," but let those ads be posted and those minors be victimized. Backpage partnered with the third-parties to revise and alter the content of those ads, developing them into more effective ads that masked their illegal nature from law enforcement officials who know to look for those buzzwords. Doc. 21-8, at 9-10, 85-100. While performing all these acts, Backpage continued to lie to the public, maintaining that all it did was passively permit others to post ads for devastating human trafficking.

As the U.S. Senate Permanent Subcommittee concluded, there is substantial reason to believe that "Backpage's public defense is a fiction." Doc. 21-8, at 65. In the light of this compelling information as well as other evidence, the Attorney General launched an investigation into whether Backpage has violated Missouri consumer-protection laws. The Attorney General issued two separate Civil Investigative Demands to Backpage and to its CEO, Carl Ferrer, § 407.040, RSMo. But instead of complying with those requests, Backpage filed this section 1983 lawsuit against the Attorney General, arguing that Backpage is immune from any investigation and that the Attorney General had brought the subpoena in bad faith. Doc. 1, ¶¶ 50-74. The Attorney General filed a motion to dismiss, Doc. 21, which remains pending.

In the meantime, the Attorney General exercised his authority to promulgate rules necessary to administering and enforcing the MMPA. § 407.145, RSMo. The regulation at issue here merely "specifies the settled meanings of certain terms used in the enforcement of the [MMPA] and provides notice to the public of their application." 15 CSR 60-16.040. The regulation does not create new substantive liability; it instead provides illustrative examples of "certain specific practices that violate section 407.020, RSMo." *Id.*

Backpage challenges only one subprovision of one regulation. That regulation is triggered if a "person advertises, sells, offers, or provides any merchandise that constitutes or involves" illegal prostitution. 15 CSR 60-16.040(1)(A). Once the regulation is triggered, a person may not "advertise, sell, offer, or provide any merchandise" without disclosing that it advertises, sells, offers, or provides merchandise that includes illegal prostitution. 15 CSR 60-16.040(1), (1)(B). The regulation can be enforced against a publisher only if the

6

government can establish knowledge. § 407.020.2(1), RSMo. In other words, if a person advertises for illegal prostitution or otherwise sells merchandise that includes illegal prostitution, the person cannot engage in other commerce without first disclosing its involvement with illegal prostitution. The pertinent parts of the regulation read as follows:

> PURPOSE: The attorney general administers and enforces the provisions of the Merchandising Practices Act, Chapter 407, RSMo. The attorney general may make rules necessary to the administration and enforcement of the provisions of Chapter 407, RSMo, and, in order to provide notice to the public, may specify the meaning of terms, whether or not used in the Act. This rule specifies the settled meanings of certain terms used in the enforcement of the Act and provides notice to the public of their application. This rule does not contain an exhaustive list of practices that violate the Act. Instead, this rule identifies certain specific practices that violate section 407.020, RSMo.
>
> (1) It is an unfair, deceptive, fraudulent, and otherwise unlawful practice for any person, whether directly or indirectly, to advertise, sell, offer, or provide any merchandise if—
>> (A) The person advertises, sells, offers, or provides any merchandise that constitutes or involves any commercial sexual conduct; and
>> (B) The person does not expressly disclose that the person advertises, sells, offers, or provides the merchandise described in subsection (1)(A)—1) in all advertisements made by or on behalf of that person; 2) to all other persons with whom the person enters into any transaction involving trade or commerce; 3) in written form conspicuously displayed on the exterior of any structure in or from which the person conducts any activities relating in any way to the merchandise described in subsection (1)(A); and 4) in all filings, applications, and other representations made to any branch of state government or to any municipality, county, or other political subdivision.

15 CSR 60-16.040.

The regulation also includes a definition of "commercial sexual conduct" that expressly incorporates the definition of "commercial sexual conduct" from Missouri statutes. *See* 15 CSR 60-16.010(1)(B). Specifically, that definition states: "'Commercial sexual conduct' shall mean any sexual conduct—*as that term is defined in section 566.010(5), RSMo*—on account of which anything of value is given to or received by any person." *Id.* (emphasis added). Section 566.010(5) of the Missouri Revised Statutes defines "sexual conduct" as "sexual intercourse, deviate sexual intercourse or sexual contact," and Sections 566.010(3), (6), and (7) provide detailed and specific definitions of "sexual intercourse," "deviate sexual intercourse," and "sexual contact." Mo. Rev. Stat. § 566.010(3), (5), (6), (7).

## ARGUMENT

The Court considers four factors in determining whether to grant a temporary restraining order or a preliminary injunction: "(1) whether the movant is 'likely to prevail on the merits'; (2) the threat of irreparable harm to the movant; (3) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; and (4) the public interest." *TCF Nat. Bank v. Bernanke*, 643 F.3d 1158, 1162 (8th Cir. 2011). Likelihood of success is "the most important of the four factors." *Arnzen v. Palmer*, 713 F.3d 369, 372 (8th Cir. 2013) (citation omitted). Where a plaintiff "seek[s] to enjoin enforcement of a validly enacted statute, they must establish as a threshold matter that they are 'likely to prevail on the merits.'" *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1053-54 (8th Cir. 2014). A plaintiff cannot do so without a "strict probabilistic determination" of likelihood of success. *Id.* In other words, no matter how

8

much evidence Backpage presents about irreparable harm and the public interest, it cannot succeed if it does not establish that its position on the merits is likely to succeed. *See id.*

Backpage thus faces a high burden. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted) (emphasis in original). And because Backpage seeks to "thwart a state's presumptively reasonable democratic processes," this Court must give "appropriate[] deferen[ce]" to the Attorney General. *Otto*, 744 F.3d at 1054 (citation omitted). Backpage, moreover, has challenged the regulation as facially invalid even though the regulation applies to companies who do not provide Internet forums. And Backpage challenged this regulation before any enforcement action, making it more difficult to establish any concrete, clear-cut controversy.

Backpage cannot meet this burden. Backpage's argument rests on an unjustifiable reading of the regulation. The only reasonable reading of the regulation leads to the conclusion that Backpage's motion is unripe and that the regulation does not run afoul of the CDA, the First Amendment, or the doctrine of unconstitutional vagueness. Nor has Backpage come anywhere near establishing that the potential harms it faces outweigh those harms that would befall enjoining enforcement of a democratically enacted statute as clarified by the interpretative regulation at issue.

## I.    Backpage Fundamentally Misreads the Regulation.

Backpage's argument rests on a flawed reading of the regulation—a reading that undermines its entire case. Backpage insists that the regulation reaches an extremely broad

array of protected non-commercial, ordinary sexual conduct and fails to include any scienter requirement. Both contentions lack merit.

### A. The regulation concerns illegal prostitution and penalizes not the advertising of illegal prostitution, but lying about or concealing that act.

Backpage rests its argument on the mistaken and unjustified view that the regulation would impose liability on broad swaths of ordinary human activity. It insists that the regulation imposes liability for advertising for "anything directly or indirectly involving sex for anything of value." Pl. Br. 1. And it presents a parade of horribles of acts supposedly covered by the regulation: any service at all provided to a prostitute (such as permitting a prostitute to purchase a cell phone), sales of condoms by convenience stores, and transferring a bottle of wine to a sexual partner even if the wine is not part of a *quid pro quo* transfer in exchange for sex. Pl. Br. 3, 19, 22, 24.

Backpage arrives at this unsound interpretation by disregarding definitions expressly incorporated into the regulation. Backpage asserts that "the Regulation defines 'commercial sexual conduct' as 'any sexual conduct … on account of which anything of value is given to or received by any person.'" Pl. Br. 18 (ellipsis in original). That representation is misleading because Backpage conceals with an ellipsis that the regulation incorporates other definition provisions. The regulation defines "commercial sexual conduct" not as Backpage does, but as "any sexual conduct—***as that term is defined in section 566.010(5), RSMo***—on account of which anything of value is given to or received by any person." 15 CSR 60-16.010(1)(B) (emphasis added). Backpage's complete failure to consider section 566.010(5) and Backpage's obscuring ellipsis undermine its argument.

10

Section 566.010 clarifies that the regulation concerns illegal prostitution, not the vast array of ordinary activities Backpage presents. Section 566.010 defines "sexual conduct" as "sexual intercourse, deviate sexual intercourse or sexual contact." § 566.010(5), RSMo. Thus, under the regulation, the full definition of "commercial sexual conduct" is "sexual intercourse, deviate sexual intercourse or sexual contact," as defined in section 566.010, "on account of which anything of value is given to or received by any person." § 566.010(5), RSMo; 15 CSR 60-16.010(1)(B). That definition is materially identical to the definition of "prostitution" in the very next chapter: "sexual intercourse, deviate sexual intercourse, or sexual contact" "in return for something of value to be received by any person." § 567.020.1, RSMo ("A person commits the offense of prostitution if he or she engages in or offers or agrees to engage in sexual conduct with another person in return for something of value to be received by any person."); *see also* § 567.010(4), (7), RSMo.

This deliberate incorporation of the prostitution statute establishes that the regulation carries the same meaning as illegal prostitution under Missouri law. The law is well-established that provisions should be construed similarly when they use similar terms. *See, e.g.*, *Northcross v. Bd. of Ed. of Memphis City Sch.*, 412 U.S. 427, 428 (1973) ("The similarity of language in [two provisions] is, of course, a strong indication that the two statutes should be interpreted *pari passu*."). The Missouri Supreme Court has adopted that venerable canon when construing Missouri law. *Earth Island Inst. v. Union Elec. C*o., 456 S.W.3d 27, 39 n.4 (Mo. 2015) ("Statutes addressing the same subject matter (in other words, *in pari materia*) are intended to be read consistently and harmoniously." (citation

11

and internal quotation marks omitted)). Because this court is construing state law, it should construe the regulation, which by its text concerns "human trafficking," consistently with the state prostitution statute and hold that the regulation concerns illegal prostitution. In particular, the provision Backpage challenges requires a person who "advertises, sells, offers, or provides any merchandise that constitutes or involves" prostitution to disclose that they do so before engaging in further commerce. 15 CSR 60-16.040(1).

Even if this reading of the statute were not the only plausible reading—which it is—this Court would still need to adopt the Attorney General's interpretation. Backpage has raised a challenge under the First Amendment, but this Court must avoid constitutional questions if possible, "presum[ing] the . . . legislature did not intend its statute to be interpreted in a manner which raises serious constitutional questions." *North Dakota v. Heydinger*, 825 F.3d 912, 925 (8th Cir. 2016). "It has long been a fundamental tenet of First Amendment law that in determining a facial challenge to a statute, if it be 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld." *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397 (1988). Backpage can prevail only if no reasonable construction would save the regulation from unconstitutionality. That burden is insurmountable here.

The close tracking between the regulation and the prostitution statute also distinguishes this regulation from those statutes applicable in previous cases in which Backpage was a party. For example, the Washington case cited by Backpage, in determining that the statute was overbroad because it "encompasse[d] transactions that are not illegal," expressly remarked that the challenged statute deviated from the prostitution

12

statute because it used materially different language. *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1280-81 (W.D. Wash. 2012). The regulation here, in contrast, is materially identical to Missouri's prostitution statute.

The regulation is further distinct from previous cases because the regulation imposes liability not for advertising for illegal prostitution, but for misleading consumers. Previous courts were clear that statutes in other states were problematic because those statutes attempted to impose liability for permitting third parties to post illegal content—conduct protected by the CDA. *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *7 (D.N.J. Aug. 20, 2013) ("[T]he Act is inconsistent with Section 230 of the CDA because it criminalizes the 'knowing' publication, dissemination, or display of specified content."); *McKenna*, 881 F. Supp. 2d at 1268 (holding unlawful a statute because it "makes it a felony to knowingly publish, disseminate, or display or to 'directly or indirectly' cause [specified] content to be published"); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 816 (M.D. Tenn. 2013) (holding unlawful a statute because it creates "an offense for the sale or the offer to sell 'an advertisement that would appear to a reasonable person to be for the purpose of engaging in what would be a commercial sex act . . . with a minor'"). In contrast to those statutes, the regulation here does not impose liability for selling or advertising certain conduct. It instead imposes liability for misleading the public about doing so or for concealing other important information from consumers. Persons under this regulation are free to engage in conduct protected by the CDA. Liability is imposed only when they fail to make the necessary disclosures.

13

## B.  The regulation includes a scienter element.

Backpage's pattern of misinterpretation extends to its assertion that the regulation permits the government to impose liability without establishing scienter. Backpage concedes that "the MMPA contemplates that a publisher cannot be liable absent scienter." Pl. Br. 15; *see also* Pl. Br. 31 n.23 ("The MMPA also contains a scienter requirement for criminal charges . . . ."). The statute provides that no person may be held criminally liable unless the person "willfully and knowingly engages in any act" declared unlawful "with the intent to defraud." § 407.020.3, RSMo. And although the statute ordinarily "does not put forth a scienter requirement for civil liability," *Plubell v. Merck & Co*., 289 S.W.3d 707, 713 (Mo. Ct. App. 2009), the statute includes an exception requiring a scienter element for publishers before imposing civil liability. That exception provides that no "owner or publisher of any . . . publication or printed matter wherein such advertisement appears" may be held civilly or criminally liable "when the owner, publisher or operator has no knowledge of the intent, design or purpose of the advertiser." § 407.020.2(1), RSMo. Backpage argues that this scienter element concerns only "generalized knowledge," Pl. Br. 30, but the reference to the knowledge of the intent of a specific advertiser makes clear that the scienter element refers to specific advertisements.

Despite its concession that the MMPA statute imposes a scienter requirement, Backpage nonetheless argues that the failure to repeat the scienter element in the regulation means that the regulation "contradicts the underlying statute." Pl. Br. 31 n.23; *accord* Pl. Br. 15. But Backpage provides no authority for its argument that scienter elements must be repeated in regulations. Nor would that requirement make sense. The regulation does not

14

impose liability. Section 407.020 does so. The regulation merely "specifies the settled meanings of certain terms" in section 407.020 "and provides notice to the public of their application." 15 CSR 60-16.040. Because the statute, not the regulation, provides liability, nothing requires that the regulation specify the scienter element that is already denoted in the statute.

Backpage contends that the scienter element for civil liability is insufficient because it applies only to advertisements. Pl. Br. 29. But Backpage does not contend that it does anything other than advertising that might be actionable under the regulation, so it lacks standing to assert that challenge. Backpage raises a scienter argument only because Backpage asserts that a scienter element is necessary to comply with the First Amendment. Pl. Br. 26-31. Backpage has not argued and therefore has forfeited the claim that a scienter element is needed for commercial conduct that does not involve advertisements and therefore is not subject to the First Amendment. *See Siepel v. Bank of Am., N.A.*, 239 F.R.D. 558, 566 (E.D. Mo. 2006), *aff'd by* 526 F.3d 1122 (8th Cir. 2008).

Backpage also speculates that the scienter requirement "would apparently" apply only as an affirmative defense. Pl. Br. 29. Yet Backpage provides no support for its contention, and for good reason. First, that argument conflicts with Backpage's admission that "the MMPA contemplates that a publisher cannot be liable absent scienter." Pl. Br. 15. Second, it conflicts with decision of the Missouri Supreme Court holding that the statute— and therefore the regulation—includes a "scienter element." *State v. Shaw*, 847 S.W.2d 768, 776 (Mo. 1993). And third, the General Assembly chose not to designate these elements as affirmative defenses even as it designated other elements in the same chapter

15

as affirmative defenses. § 407.569, RSMo ("It shall be an affirmative defense . . . .");
§ 407.589.1, RSMo (same); § 407.931.9 (providing an "affirmative defense" to persons
who sell tobacco to underage youths if they were presented with a fake government ID).
Where the legislature "has shown elsewhere in the same statute that it knows how to make
such a requirement manifest," this Court "do[es] not lightly assume that [the legislature]
has omitted from its adopted text requirements that it nonetheless intends to apply." *Watt
v. GMAC Mortg. Corp.*, 457 F.3d 781, 783 (8th Cir. 2006) (quoting *Jama v. Immigration
& Customs Enf't*, 543 U.S. 335, 341 (2005)); *see also Russello v. United States*, 464 U.S.
16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute
but omits it in another section of the same Act, it is generally presumed that Congress acts
intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).
The decision of the General Assembly to designate some elements as affirmative defenses,
but not the scienter elements at issue, indicates that these scienter elements are not
affirmative defenses.

## II.   This Court has no subject-matter jurisdiction because Backpage's claims are unripe.

When the regulation is properly understood, it becomes clear that Backpage's
asserted cause of action is unripe. "Both [standing and ripeness] are requirements for
Article III subject matter jurisdiction." *Kennedy v. Ferguson*, 679 F.3d 998, 1001 (8th Cir.
2012). "[T]he ripeness inquiry merges almost completely with standing," *Thomas v.
Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1137 (9th Cir. 2000) (en banc), and "at
the preliminary injunction stage, plaintiffs must make a clear showing of each element."

16

*Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013). "[T]he ripeness inquiry requires examination of both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1038 (8th Cir. 2000) (citations and internal quotation marks omitted). The fitness inquiry "safeguards against judicial review of hypothetical or speculative disagreements." *Id.* It prohibits considering a claim that "rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Parrish v. Dayton*, 761 F.3d 873, 875-76 (8th Cir. 2014) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). The harm inquiry prohibits a court from exercising jurisdiction except where the plaintiff has established an "immediate injury," *Wersal v. Sexton*, 674 F.3d 1010, 1018 (8th Cir. 2012), that is also substantial and redressable, *MidAmerican Energy*, 234 F.3d at 1038. Backpage has failed to meet its burden.

Backpage cannot establish anything more than a "hypothetical disagreement" that poses no immediate injury because it has not contended that it engages in or intends to engage in conduct covered by the regulation. The subprovision Backpage challenges is triggered if Backpage "advertises . . . any merchandise that constitutes or involves" illegal prostitution and has knowledge of the illegal "intent, design or purpose of the advertiser." 15 CSR 60-16.040(1)(A); § 407.020.2(1), RSMo. Although Backpage admits that its website is replete with advertisements for illegal prostitution, it also asserts that it does not knowingly permit third-parties to post illegal advertisements on its website. Backpage maintains that it "block[s] and remove[s] content that violates the website's rules or may be improper" and that it "prohibits illegal content and activity on its website and takes

17

extensive steps to prevent such misuse, especially to guard against any form of trafficking or child exploitation." Doc. 51-1 ¶¶ 21-22. Backpage cannot establish ripeness when it asserts that it never takes action covered by the regulation.

To be sure, the Attorney General has substantial reason to believe, as the U.S. Senate Permanent Subcommittee concluded, that "Backpage's public defense is a fiction." Doc. 21-8, at 65. Considerable evidence suggests not only that Backpage knows of the intent behind particular third parties who post particular ads for illegal prostitution, but that Backpage partners with those third parties to create illegal content and also posts its own illegal advertisements. For example, the manual used by Backpage agents describes how Backpage agents trawl the Internet for advertisements for illegal commercial sex, create similar ads to those found on competitor websites, and then send the newly created ads to the users of those competitor sites with offers to publish the ads on Backpage. *See, e.g.*, Doc. 21-15, at 22, 34. One email from Backpage states, "If you'd like to see the free ad I've already created for you look at the next email . . . ." Doc 21-16, at 1 (emphasis added).

But even though Backpage's public defense is likely a fiction, as long as it maintains that crumbling façade, it cannot establish ripeness. Backpage, not the Attorney General, bears the burden of establishing ripeness. *See MidAmerican Energy Co*., 234 F.3d at 1039. It cannot meet its burden by bringing a facial challenge to the regulation while simultaneously denying that it engages in any conduct covered by the regulation. Backpage's asserted controversy is even less ripe than the unripe claim rejected in *Renne v. Geary*, 501 U.S. 312 (1991). The plaintiffs there challenged a California provision that prohibited political parties from endorsing candidates for nonpartisan office. Although the

18

plaintiffs alleged that they "desire[d] to endorse candidates in future elections," *id.* at 321, the suit was unripe because they "do not allege an intention to endorse any *particular* candidate," depriving the Supreme Court of a "clean-cut and concrete" controversy. *Id.* at 321-22 (emphasis added). Backpage's argument is even less ripe because it does not even generally—much less particularly—assert a desire to engage in acts covered by the regulation. Its suit is "too remote and abstract an inquiry for the proper exercise of the judicial function." *Id.* at 322 (quoting *Longshoremen's Union v. Boyd*, 347 U.S. 222, 224 (1954).

Any challenge Backpage may wish to make in the future must wait until an enforcement action and ideally should be brought in state court. "[I]t is preferable that constitutional attacks on state statutes be raised *defensively* in state-court proceedings rather than in proceedings initiated in federal court." *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638 n.8 (1985). And refraining from exercising review over a pre-enforcement challenge here "has the advantage of permitting the state courts further opportunity to construe [the regulation], and perhaps in the process to 'materially alter the question to be decided.'" *Renne*, 501 U.S. at 323 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 306 (1979)).

### III.   Backpage Cannot Establish Likelihood of Success on the Merits.

Even if this Court had subject-matter jurisdiction, Backpage still would not be entitled to preliminary injunctive relief because Backpage has not shown that it is likely to succeed on the merits. Backpage argues that the CDA facially preempts the regulation, that

the regulation violates the First Amendment, and that the regulation is void for vagueness. The burden on each of these arguments is high, and Backpage fails to meet those burdens.

### A.  The CDA does not preempt the regulation.

Backpage argues that one subprovision of the regulation is preempted by the CDA under the doctrines of express preemption and conflict preemption. That argument fails at the outset because Backpage has inappropriately brought a pre-enforcement facial challenge. Backpage has asked this Court to enter a "declaratory judgment that the Regulation violates Section 230 of the CDA and the First and Fourteenth Amendments of the U.S. Constitution." Doc. 51-1, at 26. Backpage has also asked this Court to "invalidate and enjoin enforcement of the Regulation." Pl. Br. 36. But "[a] facial challenge to a [regulation] is, of course, the most difficult challenge to mount successfully, since the challenger must establish that *no* set of circumstances exists under which the [regulation] would be valid." *Otto*, 744 F.3d at 1060 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (emphasis added). Backpage cannot establish that the CDA renders all enforcements of the regulation invalid. To state a simple example, the relevant provision of the CDA applies only to providers of Internet forums, but the regulation applies to all persons. Thus, for example, the regulation would apply to a massage parlor that purports to operate as a legitimate business but, in reality, provides commercial sex with victims of human trafficking. So, too, the regulation would apply to hotels that rent rooms knowing that the renters intend to use those rooms to engage in human trafficking. Quite clearly, neither the massage parlor nor the hotel could invoke the CDA, nor could innumerable other potential defendants in enforcement actions brought under the regulation.

Much of Backpage's conduct, moreover, lies outside the scope of the CDA. As established in greater detail in the Attorney General's reply in support of its motion to dismiss, Doc. 42, at 15-16, CDA immunity applies only when illegal content is "provided by *another* information content provider," 47 U.S.C. § 230(c)(1) (emphasis added). When a company, either "in whole or in part," participates in "the creation or development" of content, it loses its immunity, 47 U.S.C. § 230(c)(1), (f)(3), because the company "becomes much more than a passive transmitter of information provided by others; it becomes the developer, at least in part, of that information," *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1166 (9th Cir. 2008). The CDA therefore does not apply when Backpage trawls the Internet for advertisements and then creates and sells its own similar advertisements.

To the extent this Court instead construes Backpage's motion as an attempt to challenge the regulation as applied, Backpage's motion fails not only because no enforcement action is pending, but also because Backpage fails to establish preemption. Backpage's burden is tremendous because the regulation protects consumers from misleading conduct. "In preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona v. United States*, 567 U.S. 387, 400 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). This regulation falls within those historic police powers because consumer protection provisions such as "those designed to prevent the deception of consumers" are "well within the scope of [a state's] police powers." *Fl. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146 (1963); *accord Plumley v. Com. of*

21

*Mass.*, 155 U.S. 461, 467 (1894) (identifying the power states have to "prevent[] deception or fraud in the sales of property"). Backpage cannot succeed unless it identifies a clear statement of congressional intent to preempt Missouri's ability to protect consumers from misleading business practices. Backpage has not done so.

Backpage's argument about express preemption merges with its argument about conflict preemption. "Express preemption occurs where a federal law explicitly prohibits or displaces state regulation in a given field." *Johnson v. MFA Petroleum Co.*, 701 F.3d 243, 248 (8th Cir. 2012). Conflict preemption occurs when "compliance with both federal and state regulations is a physical impossibility" or the challenged provision "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (citations omitted). The CDA includes only one relevant provision that expressly preempts state law. It provides, "No cause of action may be brought and no liability may be imposed under any State or local law that is *inconsistent* with this section." 47 U.S.C. § 230(e)(3) (emphasis added). In other words, express preemption occurs only if the first kind of conflict preemption occurs; a state provision is preempted (either through express preemption or conflict preemption) if the provision is incompatible with the CDA. Backpage's arguments about conflict preemption fail because compliance with both the regulation and the CDA is possible and because the regulation does not obstruct accomplishment of the purposes of the CDA.

First, Backpage has failed to establish that the regulation and the CDA are inconsistent—that is, Backpage has not established that compliance with both the regulation and the CDA is physically impossible. *Arizona*, 567 U.S. at 399. Backpage's

argument fails for the same reason its facial argument fails: most activity subject to the regulation lies far outside the scope of the CDA. Backpage's argument also fails because compliance with both regulations is physically possible even when activity falls within the scope of the CDA. Unlike the statutes in previous cases involving Backpage, this regulation includes a disclosure provision. The disclosure provision permits compliance with both the CDA and the regulation because the regulation does not punish permitting third-parties to post illegal content; it merely imposes liability for lying or deceiving by omission about that conduct if the provider knows the intent or design of the advertiser. A company that wishes to comply with the CDA by refraining from posting first-party content can simultaneously comply with the regulation by issuing the proper disclosures.

Second, Backpage has failed to establish that the regulation "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399. The policy of the CDA is to permit Internet forum providers to remove and filter content without becoming liable "publishers" for whatever content they do not remove. Congress passed section 230 of the CDA in response to a state court decision, *Stratton Oakmont, Inc. v. Prodigy Servs. Co*., 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), that held that "online service providers that voluntarily filter some messages become liable for all messages transmitted, whereas providers that bury their heads in the sand and ignore problematic posts altogether escape liability." *Roommates.Com, LLC*, 521 F.3d at 1163. "In passing section 230, Congress sought to spare interactive computer services this grim choice by allowing them to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise

unlawful messages that they didn't edit or delete. In other words, Congress sought to immunize the *removal* of user-generated content, not the *creation* of content." *Roommates.Com*, 521 F.3d at 1164 (emphases in original).

Backpage's entire argument fails because Backpage never attempts to identify a clear statement that Congress intended to supersede the historic police powers of states to prevent consumer deception. *Arizona*, 567 U.S. at 400. That failure alone undermines Backpage's argument. *Id.* Each of Backpage's other arguments lacks merit for additional reasons.

Backpage asserts that the regulation conflicts with this congressional policy by interfering with its "editorial decisions." Pl. Br. 14. Backpage never defines what it means by "editorial decisions." But to the extent Backpage refers to its right to remove some content without incurring liability for all content it does not remove, *Roommates.Com*, 521 F.3d at 1163, its argument is erroneous. The regulation does not prevent Backpage from taking advantage of the protections afforded by the CDA. It merely presents a separate requirement that companies not mislead consumers about what they do. Backpage cannot escape other separate requirements—*e.g.*, paying taxes or filing proper business paperwork—merely by asserting that the CDA protects its "editorial decisions." Nor can it escape its duty to fairly apprise consumers of the nature of its business. *See Otto*, 744 F.3d at 1062 (identifying as a deceptive practice the concealment of knowledge "of the nature of [a party's] business").

Backpage asserts that the regulation burdens its right to make "editorial decisions" because it forces providers "to preclude all third-party content that might come close to the

24

Regulation[]." Pl. Br. 16 (emphasis omitted). But Backpage's parade-of-horribles argument fails in the light of the scienter elements. Internet forum providers need not worry about content that might be illegal because they can be held liable only if the advertisement is for illegal prostitution and the forum provider knows the unlawful "intent, design or purpose of the advertiser." § 407.020.2(1), RSMo.

Nor is Backpage correct in asserting that the disclosure provision is so "onerous" that it poses a substantial obstacle to the CDA. Pl. Br. 17. Nothing about the disclosure provision is onerous. Backpage can entirely avoid the need for disclosures either by making requisite disclosures, or by removing illegal ads when it does have knowledge. Backpage asserts it does just that. Doc. 51-1 ¶¶ 21-22. And the disclosures here are no more burdensome than other disclosures frequently required by law. Food processors and retailers make similar disclosures when they print nutrition facts and ingredients on food products. 21 U.S.C. § 343-1. So, too, do restaurants when they comply with requirements to post the calorie count for meals. *E.g.*, 79 Fed. Reg. 71,156 (Dec. 1, 2014). So do manufacturers and retailers who are required to place disclosures on thousands of other products in various contexts. The disclosure provision is by no means so onerous that it substantially obstructs the purpose of the CDA.

### B.  The regulation satisfies the requirements of the First Amendment.

Backpage attacks two aspects of the regulation under the First Amendment. Backpage argues that the regulation impermissibly hinders protected advertising, but that argument lacks merit because it is based entirely on Backpage's misreading of the regulation. In reality, the regulation targets only advertising for illegal prostitution, which

25

is categorically excluded from First Amendment protection. Backpage also argues that the disclosure provisions violate the Constitution, but those provisions are permissible because they are reasonably related to the State's interest in protecting consumers from deception by "informing [consumers] about the nature of the services offered by [Backpage]." *Otto*, 744 F.3d at 1062.

> **1. The regulation conforms to the requirements of the First Amendment because it targets only unprotected speech and is not overly broad.**

The regulation is not subject to any standard of scrutiny under the First Amendment—much less the strict scrutiny Backpage demands—because the regulation targets only unprotected speech. It is well-established that "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection." *United States v. Williams*, 553 U.S. 285, 297 (2008). And the Supreme Court has expressly rejected the argument "that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). The challenged provision overlaps with the statutory definition of prostitution. Any advertisement or speech integral to offering or conducting prostitution is "categorically excluded from First Amendment protection." *Williams*, 553 U.S. at 297. Because the regulation targets only this unprotected speech, the First Amendment does not apply. The regulation cannot be content-based and cannot be subject to strict scrutiny. Even if the First Amendment did apply, Backpage concedes that the regulation serves a compelling interest, Pl. Br. 19. It is also narrowly

tailored because it concerns only advertisements for merchandise that includes illegal prostitution. The regulation therefore would satisfy strict scrutiny if it applied.

Because the regulation's targeting of certain advertisements does not implicate the First Amendment, Backpage's claim that the regulation is overbroad necessarily fails. "The facial overbreadth doctrine is restricted in its application." *Musser v. Mapes*, 718 F.3d 996, 1001 (8th Cir. 2013). It is "not recognized . . . outside the limited context of the First Amendment." *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *State v. Mahurin*, 799 S.W.2d 840, 842 (Mo. 1990) ("Such a[n overbreadth] claim is not appropriate in this case because there is no First Amendment issue."). Because the regulation does not target protected speech, Backpage's claim that the regulation is overbroad is not cognizable.

Even if the overbreadth doctrine were to apply, it would not invalidate the regulation. "[T]he overbreadth doctrine permits the *facial* invalidation of laws that inhibit the exercise of First Amendment rights" by targeting substantially more protected speech than necessary. *Mapes*, 718 F.3d at 1001 (emphasis added). But Backpage's facial challenge to this regulation is insupportable. Even where, as here, a plaintiff brings a claim under the First Amendment to disclosure requirements, the Eighth Circuit has held that the challenge can succeed only if "the disclosure requirements are unconstitutional in *all* cases." *Otto*, 744 F.3d at 1051, 1060-61 (emphasis added) (rejecting a facial claim to disclosure requirements in health care advertising). The disclosure requirement is plainly not invalid in all cases. Because the regulation applies to commercial transactions that

27

include no protected speech at all, Backpage's inability to establish that the regulation is facially invalid thwarts its attempt to argue that the regulation is overbroad.

The regulation also is not overbroad because it does not cover substantially more speech than necessary. Because "[t]he overbreadth doctrine is 'strong medicine,'" the Eighth Circuit has made clear that the doctrine is "to be used 'sparingly' and only when the overbreadth is not only 'real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'" *Ways v. City of Lincoln*, 274 F.3d 514, 518 (8th Cir. 2001) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). This Court "will not strike down a[n] ordinance for overbreadth if its legitimate reach 'dwarfs its arguably impermissible applications.'" *Excalibur Grp., Inc. v. City of Minneapolis*, 116 F.3d 1216, 1224 (8th Cir. 1997) (quoting *New York v. Ferber*, 458 U.S. 747, 773 (1982)). As established above, the definition of "commercial sexual conduct" in the "human trafficking" regulation is materially identical to the definition of prostitution. The narrow scope of the regulation ensures that it will not reach substantially more speech than necessary.

Backpage identifies a few terms or phrases it says might be read broadly. But even if those terms were read broadly, they would not establish that the regulation was *substantially* overbroad. What is more, the terms are far narrower than Backpage suggests. For example, the regulation is triggered when a person advertises or sells merchandise that "constitutes or involves" illegal prostitution. Backpage hones in on the word "involves," arguing that anything tangentially related to prostitution "involves" prostitution, such as a taxi or Uber driver unknowingly transporting a prostitute or a person permitting a prostitute

to use a cell phone, even for innocent purposes.  Pl. Br. 3, 22-23. But Backpage's peripheral use of the word "involves" deviates from its ordinary meaning. "The ordinary and plain meaning of 'involved' means "to include." *United States v. Arnaout*, 431 F.3d 994, 1001 (7th Cir. 2005) (quoting *Random House Webster's College Dictionary* 689 (2d ed. 1997)); *accord United States v. Awan*, 607 F.3d 306, 313 (2d Cir. 2010) ("The ordinary meaning of 'involved' is 'to have within or as part of itself,' or to 'include.'" (quoting *Webster's Third New International Dictionary* 1191 (2002))); *United States v. Mandhai*, 375 F.3d 1243, 1247-48 (11th Cir. 2004) ("The term 'involve' means to "include."). By using the term "involve," the regulation merely encompasses not only merchandise that includes solely prostitution, but also advertisements that include prostitution as part of the merchandise, such as a package deal that includes both prostitution and a massage.

Backpage's singling out of the phrase "directly or indirectly," Pl. Br. 23, also carries no weight because the Supreme Court has squarely foreclosed the argument that the phrase is overbroad. When confronted with an Oklahoma statute providing that no covered person "shall, directly or indirectly, solicit" a "contribution for any political organization," the Supreme Court held that the section was "not substantially overbroad." *Broadrick*, 413 U.S. at 605-06, 615. Although the statute "may be susceptible of some other improper applications" and "the outermost boundaries of [the provision] may be imprecise," the statue was not so "*substantially* overbroad" to be rendered unconstitutional. *Id.* at 608, 618 (emphasis added).

### 2.   The disclosure requirement satisfies the First Amendment.

The challenged disclosure provision easily satisfies the requirements of the First Amendment. Backpage argues that the provisions are subject to strict scrutiny, Pl. Br. 32, but the Supreme Court has been explicit that disclosure requirements are not subject to strict scrutiny because they "impose no ceiling" on speech and "do not prevent anyone from speaking." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366 (2010) (citations omitted). Disclosure provisions instead are ordinarily subject to "exacting scrutiny." *Id.* And because courts "accord less protection to commercial speech than to other expression," *United States v. United Foods, Inc*., 533 U.S. 405, 409 (2001), "the less exacting scrutiny described in *Zauderer* governs" where, as here, "the challenged provisions impose a disclosure requirement" on commercial speech, *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010); *see also id*. at 255 (Thomas, J., concurring in part and concurring in the judgment) (stating that "the rule articulated in *Zauderer*" is the "standard of scrutiny to review a law that compels the disclosure of commercial speech"). Backpage concedes that the *Zauderer* standard applies if the disclosure provisions here concern commercial speech. Pl. Br. 32 (citing *Zauderer*). The required disclosure is commercial speech because it is intertwined with offers, sales, or advertisements for merchandise and is part of speech that "does no more than propose a commercial transaction." *Harris v. Quinn*, 134 S. Ct. 2618, 2639 (2014).

*Zauderer* held that disclosure requirements in commercial speech are constitutional as long as they "are reasonably related to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651. That standard is "akin to rational-basis review."

*Otto*, 744 F.3d at 1061 (quoting *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1212 (D.C. Cir. 2012)). Thus, Backpage can prevail only if it can "'negate every conceivable basis which might support' the [regulation]." *Koscielski v. City of Minneapolis*, 435 F.3d 898, 902 (8th Cir. 2006) (quoting *FCC v. Beach Communications, Inc*., 508 U.S. 307, 315 (1993)); *see also Chance Mgmt., Inc. v. South Dakota*, 97 F.3d 1107, 1114 (8th Cir. 1996) ("Under the rational basis standard, we presume legislation is valid . . . .").

Backpage cannot establish that the disclosure provisions have no reasonable relation "to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651. Preventing consumer deception is undeniably a state interest not only because it is recognized in *Zauderer*, but also because it falls within in the core historical police powers of states. *E.g.*, *Paul*, 373 U.S. at 146. Requiring disclosures is rationally related to consumer deception because the Eighth Circuit has repeatedly made clear that omissions are often misleading. *See, e.g.*, *United States v. Gater*, 868 F.3d 657, 660 (8th Cir. 2017). Indeed, the Eighth Circuit has held that consumers have an interest in understanding "the nature of [an advertiser's] business." *Otto*, 744 F.3d at 1062. Missourians have an interest in knowing the nature of Backpage's business, *id.*, including whether Backpage knowingly profits from human trafficking. This regulation pursues that interest by requiring Backpage to disclose whether it permits third-parties to advertise on Backpage for illegal prostitution, knowing that the advertisers are marketing illegal prostitution.

Backpage argues that the *Zauderer* standard is not met because the regulation requires disclosure of information that is not "purely factual" and "uncontroversial." Pl. Br. 33. But those elements are not part of the standard established in *Zauderer*. Although

31

the Court mentioned that the disclosures at issue in that case were purely factual and uncontroversial, the Court "h[e]ld that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651. Requiring disclosure of "purely factual" and "uncontroversial" information is one way for a disclosure to be "reasonably related to the State's interest in preventing deception of consumers," but nothing in *Zauderer* states that it is the only way.

In any event, the disclosure provision at issue here is purely factual and uncontroversial. The regulation requires only that a person disclose the exact condition that triggered the regulation in the first place. The challenged provision of the regulation is triggered if a "person advertises, sells, offers, or provides any merchandise that constitutes or involves" illegal prostitution. 15 CSR 60-16.040(1)(A). If that occurs, the person need only disclose "that the person advertises, sells, offers, or provides any merchandise described in section (1)(A)." 15 CSR 60-16.040(1)(B). The challenged disclosure provision requires only that the facts triggering the regulation be disclosed. Nothing could be less factual or uncontroversial than that. Backpage, in fact, acknowledges that the disclosure provision "impl[ies] a business's participation in illegal sexual conduct." Pl. Br. 34. Backpage's only argument is that the regulation imposes liability for other conduct, but that argument fails on account of Backpage's misreading of the regulation.

### C. The regulation is not void for vagueness.

A law is not automatically unconstitutional merely because it includes some vagueness. "[S]tatutes will have some inherent vagueness, for in most English words and

phrases there lurk uncertainties." *Rose v. Locke*, 423 U.S. 48, 49-50 (1975) (internal quotation marks omitted) (alteration adopted). Vagueness will render a provision unconstitutional only if the provision is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). In other words, the provision must be "so vague and indefinite as really to be no rule or standard at all." *Boutilier v. Immigration & Naturalization Serv.*, 387 U.S. 118, 123 (1967). Vagueness also "depends in part on the nature of the enactment." *Vill. of Hoffman Estates v. Flipside Hoffman Estates, Inc*, 455 U.S. 489, 498 (1982). So vagueness challenges—already difficult to achieve—are even harder to realize "with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498-99. The same is true where, as here, a provision includes a scienter requirement. *Id.*; *Boyce Motor Lines v. United States*, 342 U.S. 337, 342 (1951) ("[T]he presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of the Regulation would be so unfair that it must be held invalid.").

Backpage cannot establish that the regulation is "so vague and indefinite as really to be no rule or standard at all." *Boutilier*, 387 U.S. at 123.  The challenged provision states that if a "person advertises, sells, offers, or provides any merchandise that constitutes or involves any commercial sexual conduct"—*i.e.*, illegal prostitution—then the person must disclose as much to those with whom it wishes to enter into commercial transactions. The regulation mostly uses ordinary terms with readily understandable meanings. It also uses some terms, like "offer," that have well-settled legal meanings. Provisions are not

unconstitutionally vague when the challenged terms are "words of common understanding," *Weed v. Jenkins*, 873 F.3d 1023, 1030 (8th Cir. 2017), or terms having distinct legal or technical meanings, *see, e.g.*, *Hoffman Estates, Inc*, 455 U.S. at 501 n.18 (holding that the "technical term [at issue] has sufficiently clear meaning in the drug paraphernalia industry"). Nothing in the regulation is so vague as to render the regulation entirely standardless.

Backpage argues that there is some imprecision in the regulation's terms, but establishing some vagueness is insufficient to prove unconstitutionality. Backpage argues that "[n]o person of ordinary intelligence can know" what "directly or indirectly" means. Pl. Br. 25-26. Yet the litigants in *Broadrick* failed when they raised the same argument, contending that a statute was vague when it provided that no covered person "shall, directly or indirectly, solicit" a "contribution for any political organization." *Broadrick*, 413 U.S. at 605-08. The Supreme Court not only rejected that argument, it also described the argument as "all but frivolous." *Id.* at 607. Backpage is also incorrect that the word "involve" is vague, because the "[t]he ordinary and plain meaning of 'involved' means "to include." *United States v. Arnaout*, 431 F.3d 994, 1001 (7th Cir. 2005). So, too, "know" and "provided" have well-established ordinary meanings, and the term "offer" is a term-of-art in contract law. Pl. Br. 25-26. Although "there may be disputes" over some of the terms in the statute, those disputes do not render this regulation so standardless as to be unconstitutional. *Broadrick*, 413 U.S. at 608.

Backpage's vagueness argument is especially unavailing because Backpage does not directly challenge the actual provision that imposes liability. Backpage argues that the

regulation is vague, but the regulation merely "specifies the settled meaning of certain terms used" in section 407.020, RSMo, and "provides notice to the public of their application." 15 CSR 60-16.040. Section 407.020 is what imposes liability. If vagueness challenges are harder in civil cases because "the consequences of imprecision are qualitatively less severe," *Hoffman Estates*, 455 U.S. at 498, the same must be even truer for regulations that impose no liability at all but merely clarify a statute. The Missouri Supreme Court, moreover, has already rejected a vagueness challenge brought against the statute. *State v. Shaw*, 847 S.W.2d 768, 776 (Mo. 1993) (rejecting the challenge not only because the terms had "commonly understood meanings" or had "settled meanings in the law" but also because the statute included a scienter element). Backpage has provided no authority to suggest that a regulation passed under a valid, non-vague statute can be void for vagueness.

### D. Establishing doubt as to the regulation's meaning would require *Pullman* abstention, not show likelihood of success on the merits.

Backpage's attempt to establish likelihood of success on the merits fails for yet another reason: even if Backpage could establish uncertainty as to how the regulation applies, Backpage would not be entitled to the relief it seeks. This Court would instead need to abstain under *Railroad Commission v. Pullman Co*., 312 U.S. 496 (1941). "*Pullman* requires a federal court to refrain from exercising jurisdiction when the case involves a potentially controlling issue of state law that is unclear, and the decision of this issue by the state courts could avoid or materially alter the need for a decision on federal constitutional grounds." *Burris v. Cobb*, 808 F.3d 386, 388 (8th Cir. 2015) (quoting *Moe*

*v. Brookings Cty.*, 659 F.2d 880, 883 (8th Cir. 1981)). Backpage's challenge depends entirely on whether its interpretation of the state regulation is correct, so any determination by this Court that interpretation of the regulation was uncertain would necessarily amount to a holding that the "controlling issue of state law . . . is unclear." *Id.*

Abstention would be especially warranted here for reasons of constitutional avoidance. Because the chief justification for *Pullman* abstention is "avoiding constitutional adjudication," *see Baggett v. Bullitt*, 377 U.S. 360, 379 (1964), abstention would be warranted because the state court could interpret the law to "eliminate the constitutional issue and terminate the litigation," *id.* at 375, 379. For example, Backpage asserts that complying with the regulation "requir[es] omniscience" and that the regulation is so ambiguous that it is likely to be interpreted to cover a wide array of legal conduct, such as permitting an unknown prostitute to purchase a cell phone plan. Pl. Br. 16, 21-26. But the proper interpretation of the regulation reveals that, to the extent the regulation concerns speech, it concerns only unprotected speech. A clarifying interpretation by the state court is not only able to remove all constitutional issues but is likely to do so.

Abstention here would also preserve comity between federal and state courts. The Supreme Court has been clear that "it is preferable that constitutional attacks on state statutes be raised defensively in state-court proceedings rather than in proceedings initiated in federal court." *Zauderer*, 471 U.S. at 638 n.8. As with Backpage's initial complaint, Backpage has yet again attempted to press in this Court issues best reviewed in state court. *See* Doc. 42, at 2-16 (establishing that the Court should engage in *Younger* abstention on Backpage's initial complaint). If this Court were to determine that the meaning of the

regulation were uncertain, the state courts should be afforded the opportunity to clarify the regulation.

## IV.   The Balancing of Harms and the Public Interest Oppose Granting Preliminary Injunctive Relief.

The remaining factors include "(2) the threat of irreparable harm to the movant; (3) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; and (4) the public interest." *TCF Nat. Bank*, 643 F.3d at 1162. All three factors weigh against granting preliminary injunctive relief.

First, as many courts have recognized, an order that prevents the State from enforcing its duly enacted laws is heavily disfavored and inflicts *per se* irreparable injury on the State. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *New Motor Vehicle Bd. of Calif. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) (same); *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its law."); *Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined."); *Otto*, 744 F.3d at 1053-54 (holding that, "because Plaintiffs seek to enjoin enforcement of a validly enacted statute," they must meet "a more rigorous threshold showing than th[e] ordinary preliminary injunction test").

Second, Backpage has failed to establish any irreparable harm. The single sentence it devotes to this issue is premised on its misconstruction of the regulation. Complying with the regulation is not "a practical impossibility," as Backpage contends. Pl. Br. 35. Compliance merely requires disclosures if an Internet forum provider—or any other business—knowingly advertises for merchandise that includes illegal prostitution. Backpage contends that it fully complies with this correct understanding of the regulation, so it cannot establish any harm.

Third, the public interest favors denial of relief because "assessing the harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Missouri Supreme Court has specifically applied this principle to the MMPA, holding that once a "find[ing] that a violation of the [Misouri Merchandising Practices] Act has occurred or is about to occur, irreparable harm and harm to the public are presumed." *State ex rel. Nixon v. Beer Nuts, Ltd.*, 29 S.W.3d 828, 837 (Mo. Ct. App. 2000), *opinion adopted by the Missouri Supreme Court* (Nov. 20, 2000). A legislative enactment, moreover, "is in itself a declaration of public interest and policy." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937). Although Backpage styles its challenge as an attack on a regulation, that regulation merely provides an illustrative example of conduct that the statute, section 407.020, proscribes, so Backpage's challenge is a challenge to the statute. The statute and regulation entail a declaration of public interest.

## CONCLUSION

For the reasons stated, this Court should deny Backpage's request for preliminary injunctive relief.

Dated:          November 27, 2017          Respectfully submitted,

**JOSHUA D. HAWLEY**
Missouri Attorney General

 /s/ *D. John Sauer*
D. John Sauer, #58721
  First Assistant and Solicitor
Michael C. Martinich-Sauter, #66065
  Deputy Attorney General
Joshua Divine, #69875
  Deputy Solicitor General
Attorney General's Office of Missouri
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-3321
Fax: (573) 751-0774
E-mail: John.Sauer@ago.mo.gov

*Counsel for Attorney General Joshua D. Hawley*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 27, 2017, the foregoing was served on counsel of record for Plaintiff by operation of the Court's electronic filing system.

*/s/ D. John Sauer*
D. John Sauer