IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

BACKPAGE.COM, LLC,                    )
                                      )
      Plaintiff,                      )
                                      )
v.                                    )          Case No. 4:17-CV-01951
                                      )
Attorney General JOSHUA D. HAWLEY,    )
                                      )
      Defendant.                      )

**ATTORNEY GENERAL JOSHUA D. HAWLEY'S MOTION FOR CRIMINAL
CONTEMPT AND CIVIL SANCTIONS AGAINST BACKPAGE.COM, LLC AND
MEMORANDUM IN SUPPORT**

      The Attorney General moves this Court to enter an order requiring Backpage.com,

LLC ("Backpage"), to show cause why it should not be held in criminal contempt, an

order requiring Backpage and its counsel to show cause why they should not pay a fee in

restitution to Backpage's victims, and an order requiring Backpage and its counsel to

show cause why this Court should not require them to pay sanctions and the Attorney

General's and this Court's expenses.  Criminal and civil sanctions are warranted because

the recent criminal plea agreements entered by Backpage and its CEO reveal that this

lawsuit against the Attorney General was based on false statements and was calculated to

mislead this Court and impede a lawful investigation.

      In the light of explosive public evidence indicating that Backpage was heavily

engaged in illegal human trafficking, the Attorney General launched an investigation and

sought an order in state court to compel Backpage and its CEO, Carl Ferrer, to produce

documents.  Backpage then filed a federal complaint against the Attorney General and

1

presented itself as an innocent target of a witch hunt.  Backpage assured this Court that it was not responsible for the content of any ads for illegal human trafficking on its website. Backpage assured this Court that it never knowingly permitted illegal ads to remain on its website because it deleted all ads for illegal human trafficking that came to its attention. Backpage assured this Court that it worked closely with law enforcement officials to investigate individuals who misused its website.  And Backpage assured this Court that all its conduct was immune under the federal Communications Decency Act ("CDA"), which protects providers of Internet forums from liability when they have no involvement in creating, "in whole or in part," unlawful content that third parties post to its website. 47 U.S.C. § 230(c).

These assertions were false.  Backpage's recent plea agreements demonstrate their falsity.  In April, Backpage pleaded guilty in Texas state court to human trafficking and in Arizona federal court to conspiracy to commit money laundering.  In sworn statements before those courts, Backpage admitted that its public defense was a fiction.  Backpage confessed that it engaged in human trafficking and money laundering activity, that none of this activity was protected under the CDA, and that it consistently impeded efforts by law enforcement to investigate human trafficking activity.  While Backpage was telling this Court that it was the innocent victim of a witch hunt and that it removed all illegal content that came to its attention, it was quietly trafficking an untold number of victims and fabricating shell companies to launder millions of dollars in ill-gotten proceeds. Backpage based its lawsuit in this Court on false statements that were intended to impede and delay the Attorney General's lawful investigation.

The most appropriate form of sanction against Backpage is criminal contempt. Because Backpage has already pleaded guilty in other jurisdictions to human trafficking and money laundering, collecting a monetary award may prove difficult or impossible. But this Court can impose the stigma of criminal contempt on Backpage to serve the purpose of general deterrence against other parties who may be tempted to try similar vexatious conduct. This Court should also impose other monetary sanctions on Backpage.

## JURISDICTION

Although this Court no longer retains jurisdiction over the merits of the underlying suit, the Court has jurisdiction to issue sanctions.  The Supreme Court has squarely held that courts may impose sanctions and hold parties in contempt even "after the principal suit has been terminated" because a sanctions order "requires the determination of a collateral issue," not consideration of the merits.  *Cooter & Gell v. Hartmarx Corp*., 496 U.S. 384, 396 (1990); *accord Griggs v. Provident Consumer Discount Co*., 459 U.S. 56, 58 (1982) (per curiam) ("The filing of a notice of appeal . . . divests the district court of its control over those aspects of the case *involved in the appeal*." (emphasis added)).

## FACTUAL BACKGROUND

### I.    The Attorney General launches an investigation into Backpage's engagement in human trafficking.

Until federal authorities seized the website in April 2018, Backpage hosted www.backpage.com, which ostensibly allowed users to post advertisements for ordinary goods and services.   But Backpage obtained 99 percent of its revenue from advertisements for commercial sex, including illegal human trafficking of underage girls,

and obtained more than $3 million each week.  Doc. 21 at 3.  Its role in human trafficking was so substantial that Backpage was "involved in 73% of all child trafficking reports that the National Center for Missing and Exploited Children (NCMEC) receive[d] from the general public."  *Id.* at 2.

Backpage never denied that its website was a hub for illegal activity.  Instead, "Backpage represented to the public *and the courts* that it merely hosted content others had created."  *Id.* at 5 (emphasis added).  Under the Communications Decency Act ("CDA"), an Internet forum provider is liable for any content it creates "in whole or in part," but not for content created and posted entirely by third parties.  47 U.S.C. § 230(c)(1), (f)(3).  For years, Backpage insisted that it had no involvement with human trafficking or advertisements for illegal human trafficking and that everything it did was thus protected by the CDA.  Doc. 21 at 3.

The Attorney General uncovered substantial, compelling evidence indicating that Backpage's public defense was a fiction, that Backpage created advertisements for illegal human trafficking, and that Backpage actively facilitated creation of unlawful content by others with the intent and purpose of promoting human trafficking.  This evidence suggested that Backpage was involved in other unlawful practices, such as deceiving credit-card companies about its identity or practices so that it could continue to process transactions through companies that otherwise would not wish to associate with Backpage.  Doc. 21 at 19–20.  The Attorney General launched a full-scale investigation to determine the extent of Backpage and Ferrer's violations of Missouri law.  As part of this investigation, the Attorney General issue two separate Civil Investigative Demands

or "CIDs" to Backpage and Ferrer.  Doc. 21 at 9–10; Mo. Rev. Stat. § 407.040.  The deadline for complying with these CIDs was June 7, 2017, for Backpage, and July 7, 2017, for Ferrer.  Backpage and Ferrer never complied.  *Id.*

## II.     Backpage files a vexatious lawsuit in this Court based on statements that it knew were false.

Four days after the Attorney General filed suit in state court to enforce the CIDs, Backpage sued the Attorney General in federal court, asking this Court to enjoin the state court from considering the petition to enforce the CIDs.  Doc. 1.  Backpage's complaint was fraudulent from the outset.  Even while it was raking in millions of dollars by knowingly promoting human trafficking, Backpage told this Court that the investigation was merely a witch hunt by the Attorney General "to impose liability for speech he disfavors."  Doc. 1 ¶ 62.

Backpage's lawsuit was calculated to deceive this Court.  It constructed its complaint atop a central false edifice: all of Backpage's conduct was supposedly protected by the CDA and the First Amendment, so the Attorney General could not even *investigate* Backpage, much less bring an enforcement action against it.  Specifically, Backpage assured this Court that it never engaged in "affirmative participation in an illegal venture," *id.* ¶ 34; that it engaged only in "conduct expressly protected by Section 230," *id.* ¶ 48; and that everything it knowingly permitted on its website was "protected speech under the First Amendment," *id.* ¶ 41.

Backpage acknowledged that some illegal content was on its website, but it insisted that it had no involvement in the "creation and development" of those ads, and

that it never knowingly permitted ads for illegal human trafficking to remain on its website.  Backpage assured this Court that it would "block and remove content that violates the website's rules or may be improper;" that it would "prohibit[] illegal content and activity on its website and take[] extensive steps to prevent such misuse, especially to guard against any form of trafficking or child exploitation;" and that it would "manually review ads" to "remove those" that advertised for illegal content.  *Id.*  ¶¶ 21–22.  Backpage also asserted that it would report any suspected illegal activity to law enforcement. *Id.*

Each of these assertions was false, and Backpage made these assertions knowing they were false.  Backpage's public defense was never compelling to begin with.  It relied on specious assertions that conflicted with the vast array of public evidence indicating that Backpage was heavily engaged in human trafficking.  But to the extent its public defense had any level of credibility, that defense evaporated entirely in April 2018 when Backpage and its CEO, Carl Ferrer, pleaded guilty to federal and state criminal charges and admitted that they had long engaged in conduct outside the protection of the CDA.

Backpage pleaded guilty in a Texas state court to human trafficking and in federal court to a money laundering conspiracy.  Ex. A (federal court); Ex. B (state court); *see also* Texas Att'y Gen., *Backpage.com Pleads Guilty to Human Trafficking in Texas* (April 12, 2018).[1]  Ferrer pleaded guilty to conspiracy to facilitate prostitution.  U.S. Dep't of Justice, *Backpage's Co-founder and CEO, as Well as Several Backpage-Related*

---

[1] https://www.texasattorneygeneral.gov/news/releases/backpage.com-pleads-guilty-to-human-trafficking-in-texas.

6

*Corporate Entities, Enter Guilty Pleas* (April 12, 2018).[2]  Federal authorities also brought

a 93-count indictment against seven Backpage officials.   Alina Selyukh, *Backpage*

*Founders Indicted on Charges of Facilitating Prostitution*, Nat'l Pub. Radio (April 9,

2018).[3]

The plea agreements reveal that Backpage's lawsuit in this Court was based on

false statements, and that Backpage's only purposes in suing the Attorney General were

to mislead this Court and cause delay.  Backpage told this Court that it engaged only in

lawful conduct protected by the First Amendment and the Communications Decency Act.

But in a sworn statement in a plea agreement, Backpage admitted that the purpose of the

organization was to "knowingly facilitate the state-law prostitution crimes" on its

website.  Ex. A at 11.  Backpage told this Court that it removed any illegal content that

came to its attention.  But it admitted in sworn statements that it knew that "[t]he great

majority of the[] advertisements are, in fact, advertisements for prostitution services," and

that it did *not* remove or block this content.  *Id.*  Backpage told this Court that it worked

with law enforcement to eliminate illegal content from its website.  Doc. 1 ¶ 22.  But

Backpage admitted in its plea agreement that it instead had a "policy of concealing" its

human-trafficking activities from the public and from law enforcement.  Ex. A at 11.  In

its plea agreement, Backpage admitted under oath that its editing practices "were only

one component of an overall, company-wide culture and policy of concealing and

---

[2] https://www.justice.gov/opa/pr/backpage-s-co-founder-and-ceo-well-several-backpage-related-corporate-entities-enter-guilty.

[3] https://www.npr.org/sections/thetwo-way/2018/04/09/600360618/backpage-founders-indicted-on-charges-of-facilitating-prostitution.

refusing the true nature of the services being offered" on Backpage's website, and that its editing practices were "merely intended to create a veneer of deniability for Backpage." *Id.* Evidently, that policy of deception extended to concealing these facts from this Court even as Backpage was assuring this Court that it was merely the innocent victim of a witch hunt.

Backpage's deception went beyond lying about its human-trafficking activities. It also lied to this Court when it asserted that it was forthcoming with all companies with which it did business. The Attorney General investigated Backpage in part because the evidence indicated that Backpage was misrepresenting itself to deceive merchants and consumers into doing business with Backpage when they would prefer not to engage in commercial transactions with a company engaged in human trafficking. Doc. 21 at 19–20. Such misrepresentations violate the Missouri Merchandising Practices Act (MMPA). *Id.* Backpage responded by saying that it was honest and forthcoming with all consumers and merchants, and thus that the Attorney General could not "prosecute—or threaten to prosecute—Backpage.com under the MMPA or any other law." Doc. 1 ¶ 51; *see also id.* ¶ 46 (asserting that "the State is precluded from pursuing civil claims or prosecuting Backpage.com"). But in its sworn federal plea agreement, Backpage admitted that these assertions were false. It was not forthcoming with merchants and consumers, but instead it "conspired to engage in various money laundering offenses" to deceive such entities. Ex. A at 12. It admitted that it constructed an elaborate series of shell companies to "fool credit card companies into believing that Backpage-associated charges were being incurred on different websites." *Id.*

In addition, Backpage admitted under oath in Texas state court that it "knowingly receive[d] a benefit from participating in a venture that involved the trafficking of . . . a child younger than 18 years of age," thereby causing that child to become a victim of compelled prostitution.  Ex. B at 3.  It also admitted under oath that it engaged in money laundering the proceeds of criminal human trafficking.  *Id.* at 4.

In short, while Backpage was telling this Court that it was an innocent victim of a witch hunt and that its conduct was beyond reproach under federal law, it was quietly trafficking an untold number of victims and fabricating shell companies to launder its ill-begotten proceeds.  Backpage based its entire lawsuit in this Court on false statements intended to deceive this Court and delay the Attorney General's investigation so it could rake in more money at the expense of its victims.

### III.    Backpage compounds its fraudulent complaint.

Not satisfied simply with filing a suit centered on false statements, Backpage made every effort to divert the Attorney General's resources to fighting this frivolous suit.  Shortly after filing its complaint, Backpage moved for a preliminary injunction. Doc. 11.  Backpage again told this Court that it engaged in no unlawful conduct, that everything it did was protected by the CDA, and that the Attorney General thus could not "pursu[e] or threaten[] other action against Backpage" in good faith.  *Id.* at 3.

Faced with Backpage's aggressive litigation tactics, the Attorney General had to file a brief opposing Backpage's motion for a preliminary injunction, and the Attorney General also had to file a motion to dismiss to prevent this frivolous litigation from progressing.  In response to the motion to dismiss, Backpage continued to make false

assertions.   The Attorney General presented this Court with evidence that Backpage identified advertisements that included buzzwords indicating that the advertisements were for unlawful human trafficking, such as "teenage," "rape," "little girl," "Lolita," "fresh," "school girl," and even "Amber Alert."  Doc. 21 at 4.  The evidence indicated that Backpage was scrubbing these buzzwords from the ads and then reposting them, making it more difficult for law enforcement to detect that these advertisements were for illegal conduct, while still exposing underage victims of human trafficking to coerced commercial sexual exploitation.   Backpage responded by asserting that all it did was modify ads "from being illegal to legal."   Doc. 34 at 24.   But in its federal plea agreement, Backpage admitted that these "edits" were part of an overarching "policy of concealing" these posts from law enforcement "to create a veneer of deniability for Backpage," so that Backpage could continue to rake in millions of dollars from these illegal transactions.  Ex. A at 11.

Compounding its vexatious conduct even more, after the parties briefed the motion to dismiss and before this Court ruled on the motion, Backpage filed a second motion for preliminary injunctive relief on different issues.  Doc. 48.  In doing so, Backpage again forced the Attorney General to divert additional resources to fight its bad-faith lawsuit.

When the Attorney General prevailed in this Court, Backpage delayed proceedings further by appealing this Court's judgment to the Eighth Circuit.  Backpage's deceit continued in that forum.  There, it again falsely asserted that it "removes content that violates its posting rules or may be improper."  Ex. C at 2–3 (Backpage's brief on appeal).  It falsely asserted that, when it uncovered posts for illegal human trafficking, it

10

"reported [those posts] to law enforcement." *Id.* at 3.  These statements stand in stark contrast to its admission in one of its plea agreements that its purpose was to "knowingly facilitate the state-law prostitution crimes" on its website and that it had an overarching "policy of concealing" its actions from law enforcement, consumers, and merchants.  Ex. A at 11.  Backpage again repeated its false assertion that its intent in scrubbing buzzwords from ads was merely to convert those ads "from being illegal to legal."  Ex. C at 36–37.

Backpage's appeal to the Eighth Circuit was fully briefed, resulting in a significant expenditure of resources by the Attorney General's Office.  But shortly after Backpage's plea agreements were unsealed, publicly revealing that Backpage's statements were false, Backpage's counsel withdrew from the appeal, as well as other cases in which they were representing Backpage.  Ex. D.  The Eighth Circuit warned Backpage that the court would dismiss the appeal for lack of prosecution if Backpage did not enter counsel by June 14, 2018.  Backpage never did so, and then Backpage failed to respond to the Eighth Circuit's motion to show cause why the appeal should not be dismissed for lack of prosecution.  On July 10, 2018, the Eighth Circuit dismissed Backpage's appeal.

## ARGUMENT

### I.   This Court should impose sanctions against Backpage and its counsel under the inherent authority of this Court.

Although numerous rules and statutes enable this Court to impose sanctions, this Court need not rely on those provisions, and this Court is not constrained to follow the procedures required by those provisions.  Instead, "the inherent power of a court can be

11

invoked even if procedural rules exist which sanction the same conduct." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991).

This Court should issue sanctions under its inherent powers because Backpage's deception infected the entire case. Rule 11 of the Federal Rules of Civil Procedure enables this Court to issue sanctions, but that Rule is tailored toward addressing misconduct that occurs in individual filings. Inherent powers are better suited where, as here, the nonmoving party's "entire course of conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court." *Id.* at 51. Backpage's misconduct is not limited to a single pleading. Its false statements served as the linchpin for the entire lawsuit. This Court's inherent powers give this Court greater flexibility to address the sanctionable conduct that infected the entire lawsuit.

**A.  The evidence provides substantial justification to sanction Backpage.**

Backpage's conduct warrants sanctions under this Court's inherent authority because Backpage repeatedly lied to this Court. "Making misrepresentations to the fact finder is inherently obstructive . . . ." *United States v. Thoreen*, 653 F.2d 1332, 1340 (9th Cir. 1981). Thus, the Supreme Court "ha[s] consistently indeed without exception allowed sanctions for false statements." *United States v. Mandujano*, 425 U.S. 564, 577 (1976). Central to Backpage's Complaint were its allegations that it had no active involvement in human trafficking, that it went to great pains to remove illegal content from its website, and that it was forthcoming with merchants and consumers about all its activities. Each of those central assertions was false, and Backpage knew those assertions were false the whole time. Backpage has now admitted under oath that its

purpose was to "knowingly facilitate" human trafficking on its website, that it took every opportunity to conceal its actions from law enforcement, and that it constructed a labyrinth of shell organizations to "fool credit card companies into believing" they were doing business with somebody else.  Ex. A at 11–12.  Backpage has also admitted that at least some of its victims were minors. Ex. B at 3.

These false statements caused harm not only to the Attorney General and to Backpage's victims, but also to this Court.  On their own, false statements obstruct the truth-seeking function of the courts. *Thoreen*, 653 F.2d at 1340.  When false statements serve as the linchpin for an entire lawsuit, the obstruction is more severe.  But for Backpage's false statements, the lawsuit never would have existed.  Backpage's entire theory of this case was premised on fraud.  Backpage's filing of a lawsuit premised on intentionally false statements constituted "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas Glass Co. v. Hartford-Empire Co*., 322 U.S. 238, 246 (1944).

To rectify these harms, this Court should use its inherent powers to impose at least three sanctions on Backpage: fines for criminal contempt, an award of attorney's and court fees, and penalties and fees paid into a fund for restitution to human-trafficking victims; as well as any other criminal or civil sanctions that this Court deems just and proper.

*First*, this Court should hold Backpage in criminal contempt and impose punitive sanctions for abuse of the judicial process.  Backpage abused the judicial process when it

13

initiated a civil lawsuit predicated on falsehoods to impede a lawful investigation into Backpage's criminal activity.  Although attorney's fees awards "must be compensatory rather than punitive in nature," courts can impose punitive sanctions both through their inherent powers and by statute.  *See Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1182 (2017).  Courts can also impose punitive sanctions—which are criminal in nature—without formally holding parties in contempt.  *Id.*

Several statutes enable this Court to hold Backpage in criminal contempt for its "disobedience or resistance to [the Court's] process."  18 U.S.C. §§ 401–02; *accord* 42 U.S.C. § 1995.  The Eighth Circuit routinely upholds such sanctions.  *E.g.*, *Isaacson v. Manty*, 721 F.3d 533, 541 (8th Cir. 2013) (upholding imposition of ten criminal contempt sanctions, one for each false statement).  But this Court's inherent powers give even broader authority to hold Backpage in criminal contempt.  *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) ("Courts . . . have embraced an inherent contempt authority.").

Holding Backpage in criminal contempt and imposing fines—or even merely imposing punitive fines without a formal holding of criminal contempt—are appropriate sanctions for Backpage.  Backpage's conduct went far beyond merely imposing costs on this Court and the Attorney General.  Those harmed most by Backpage's vexatious delay are Backpage's human trafficking victims, who cannot be numbered and who include countless young girls forced into the horrors of underage prostitution on Backpage's website.  *See, e.g.*, Tom Jackson, et al., *16-Year-Old Was Found Beaten, Stabbed to Death After Being Advertised as Prostitute on Backpage*, *Washington Post* (July 11,

14

2017).[4] By repeatedly lying to this Court so that Backpage could continue its crimes, Backpage criminally abused the judicial process.

Civil sanctions alone would not sufficiently deter Backpage or parties situated similarly to Backpage.  Because Backpage is a company, not an individual, this Court cannot incarcerate Backpage after holding it in criminal contempt.   But because Backpage has already pleaded guilty to crimes in other jurisdictions, collecting a monetary fine may be difficult.  Punitive sanctions—which are criminal in character—are thus most appropriate because they impose a stigma and warn individuals that this Court can imprison those individuals for similarly vexatious conduct.   Imposing criminal sanctions would serve general deterrence purposes because it would send a signal that courts will not tolerate flagrant abuses of the judicial process.[5]

*Second*, this Court should order Backpage to pay the Attorney General's fees and costs and also to pay to the Clerk of this Court the costs associated with adjudicating its frivolous lawsuit.  "If a plaintiff initiates a case in complete bad faith, so that every cost of defense is attributable only to sanctioned behavior, the court may again make a blanket award."  *Haeger*, 137 S. Ct. at 1188.  Between responding to two different motions for preliminary injunctions, briefing a motion to dismiss, and fully briefing an appeal, the

---

[4] https://www.washingtonpost.com/local/public-safety/how-a-16-year-old-went-from-backpage-to-prostitution-to-homicide-victim/2017/07/10/72eca33c-5f55-11e7-a4f7-af34fc1d9d39_story.html.

[5] If this Court determines that criminal contempt and punitive fines are appropriate, it must give Backpage the protection of criminal procedures, including the heightened burden of proof for criminal convictions. *Bagwell*, 512 U.S. at 834. But this Court will not need to give Backpage the benefit of a jury trial as long as the fines assessed for each violation are not exorbitant. *Muniz v. Hoffman*, 422 U.S. 454, 475–76 (1975).

Attorney General's Office has needlessly expended hundreds of hours of resources due to Backpage's fraudulent behavior.

*Third*, this Court should require Backpage to pay a substantial fee into a fund for victims of Backpage's crimes. This Court possesses "a large measure of discretion in deciding what sanctions are appropriate for misconduct." *Hutchins v. A.G. Edwards & Sons, Inc.*, 116 F.3d 1256, 1260 (8th Cir. 1997) (citation omitted); *accord Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009) (holding that "a federal court's inherent powers include broad discretion to craft proper sanctions"); *Chambers*, 501 U.S. at 45 (holding that "even a particularly severe sanction . . . is within the court's discretion"). Although Backpage's false statements have caused substantial inconvenience to the Attorney General and this Court, this inconvenience pales in comparison to the ongoing injuries inflicted on those hit hardest by Backpage's behavior—Backpage's human-trafficking victims, who continued to suffer harm while Backpage took every opportunity to drag out legal proceedings and delay investigation as long as possible. Although a victim of a crime as horrific as those crimes Backpage perpetrated can never be "compensated," this Court should order Backpage to pay a significant fee to fund restitution to its victims.

**B. This Court should use its inherent authority to impose civil sanctions on Backpage's counsel.**

This Court should require Backpage's counsel, the lawyers of the law firm Davis Wright Tremaine LLP, to reimburse the Attorney General and this Court for their expenses, and the Court should impose other civil sanctions on these attorneys as well.

16

These counsel falsely asserted on behalf of Backpage that Backpage was not directly involved in any human trafficking conduct and that it engaged only in lawful activity. Counsel cannot evade responsibility for these false statements merely by claiming that Backpage deceived them or that they were unaware of Backpage's illegal activities. An attorney is obligated to "conduct a reasonable inquiry of the factual and legal basis for a claim before filing." *Coonts v. Potts*, 316 F.3d 745, 753 (8th Cir. 2003). "To constitute a reasonable inquiry, the prefiling investigation must uncover a factual basis for the plaintiff's allegations, as well as a legal basis." *Id.*

Even assuming that counsel did not know that its assertions on behalf of Backpage were false, counsel made those assertions in the face of numerous red flags that would have cautioned any reasonable attorney to engage in a thorough investigation before filing its vexatious lawsuit. First, in October 2016, months before Backpage filed suit in this Court, its CEO, Carl Ferrer, was arrested on human trafficking charges, and arrest warrants were issued for numerous other Backpage officials. *E.g.*, Don Thompson & Terry Wallace, *Backpage.com Raided, CEO Arrested for Sex-Trafficking*, *Assoc. Press* (Oct. 6, 2016).[6] These events indicated that, at the very least, some States had probable cause to believe that Backpage was engaging in human trafficking activity or other actions not immunized by federal law.

Second, two months after Ferrer's arrest, he was indicted again—this time on charges that he had duped credit card companies by setting up sham shell organizations to trick credit card companies into believing they were doing business with somebody else.

---

[6] https://apnews.com/2d89a01c2ff14106beeb7570747c46af.

*See* Ex. E.  Counsel for Backpage in this proceeding knew of these charges because they represented Backpage in the criminal proceedings in California.  *See, e.g.*, Ex. F.  This new indictment should have cautioned Backpage's counsel that they needed to conduct a thorough factual inquiry before making the spurious allegations in this case.  Instead, even while they knew Ferrer had been indicted for misrepresenting Backpage to credit card companies, counsel falsely asserted on behalf of Backpage that Backpage was fully compliant with the Missouri Merchandising Practices Act, which penalizes the laundering schemes to which Ferrer and Backpage have pleaded guilty.

Third, two months later, on January 19, 2017, a permanent subcommittee of the U.S. Senate released an explosive report indicating that Backpage was engaged in substantial human trafficking activity.  The report stated that Backpage is "aptly described" "as a 'hub' of 'human trafficking, especially the trafficking of minors,'" because "Backpage is involved in 73% of all child trafficking reports that the National Center for Missing and Exploited Children (NCMEC) receives from the general public." Doc. 21 at 3.  It reported that 99 percent of the revenue Backpage obtained was from advertisements for commercial sex, including illegal human trafficking of underage girls, and obtained more than $3 million each week.  *Id.*  And it found that Backpage affirmatively concealed illegal ads from law enforcement.  Backpage would identify ads that include key buzzwords indicating that a victim is underage, such as "teenage," "rape," "little girl," "Lolita," "fresh," "school girl," and even "Amber Alert."  Doc. 21 at 4.  Then, knowing that those advertisements were for illegal, forcible sex trafficking, Backpage helped third parties revise and alter the content of those ads.  Backpage

18

scrubbed the buzzwords from the ads, developing the ads into more effective ads that masked their illegal nature from law enforcement officials who know to look for those buzzwords.  Doc. 21-8 at 8–10; 85–106.

This report wholly undermined Backpage's public defense, but its lawyers reiterated that defense as officers of this Court.  Backpage's lawyers assured this Court that Backpage *deleted* ads for human trafficking, Doc. 1 ¶¶ 21–22, but the Senate report indicated instead that Backpage was an active participant in creating those ads and that it did not delete ads that it knew were advertisements for human trafficking.  Instead, Backpage concealed those ads from law enforcement.  Backpage admitted in its plea agreement that these "edits" were part of an overarching "policy of concealing" these posts from law enforcement so it could continue to rake in profits from these illegal advertisements for human trafficking. Ex. A at 11.

Fourth, shortly after the Senate released this report, documents published by the Washington Post further confirmed that Backpage was involved in rampant illegal conduct.  Those documents showed that Backpage operated outside the protection of the Communications Decency Act by creating illegal advertisements to entice advertisers to switch from competitor websites to Backpage.  An internal Backpage manual describes how Backpage agents trawled the Internet for ads for illegal human trafficking, created ads similar to those found on competitor websites, and sent the newly created ads to the users of those competitor sites with offers to publish the Backpage-created ads for free. *See, e.g*., Doc. 21-15 at 22, 34.  The manual directed agents to "pre-board" the Backpage-created ads onto Backpage.com and then send a scripted email to the user of competitor

19

websites that stated, "If you'd like to see the free ad I've already *created* for you look at the next email . . . ."   Doc. 21-16 at 1 (emphasis added).   By creating ads for illegal services that Backpage hosted for free, Backpage attempted to entice users of competitor websites to switch to Backpage, where they then paid for later ads.

The documents also revealed that Backpage created illegal advertisements to entice persons seeking to purchase illegal sex trafficking services to visit Backpage's website.   Backpage "created phony sex ads, offering to 'Let a young babe show you the way' or 'Little angel seeks daddy,' adding photos of barely clad women and explicit sex patter."   Doc. 21-10 at 1.   "Then, when a potential customer expressed interest, an email directed that person to Backpage.com, where they would find authentic ads . . . ."   *Id.*   In other words, Backpage created illegal advertisements for phony sex trafficking to draw in web users and redirect them to advertisements where actual persons—especially young girls—became victims.

Backpage's counsel knew of the many indictments.   They knew about the U.S. Senate report.   And they knew about the documents obtained and published by the Washington Post.   Yet they nonetheless repeatedly asserted the outlandish and false statements that Backpage was fully compliant with the law, that it never took part in human trafficking, that it removed all illegal content that came to its attention, that it worked closely with law enforcement officials to expose and uncover criminals using its site, and that the Attorney General had no good-faith basis to launch an investigation. Backpage's counsel either relayed false statements on behalf of Backpage with full knowledge that those statements were false, or counsel willfully ignored overwhelming

20

public evidence that the assertions it was making were false.  In either case, sanctions are warranted.  "Sticking one's head in the sand is more than undignified. It is sanctionable." *Khalil v. Town of Cicero*, 916 F.2d 715 (7th Cir. 1990).

## II.    This Court should also impose sanctions against Backpage's counsel under 28 U.S.C. § 1927.

This Court should also impose sanctions against Backpage's counsel under the authority granted to this Court by statutory law.  Section 1927 enables this Court to award attorney's fees where counsel "multiplies the proceedings in any case unreasonably and vexatiously."  28 U.S.C. § 1927.  Sanctionable conduct under this provision occurs "when attorney conduct, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court." *Lee v. First Lenders Ins. Servs., Inc*., 236 F.3d 443, 445 (8th Cir. 2001) (citation omitted).  "If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious." *Dal Pozzo v. Basic Mach. Co*., 463 F.3d 609, 614 (7th Cir. 2006) (citation omitted).  Sanctions under this section are especially appropriate where, as here, an attorney's actions infect a larger "course of conduct," not just a single signed filing. *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 948 F.2d 1338, 1346 (2d Cir. 1991).

Backpage's counsel unnecessarily multiplied the proceedings in three ways.  First, they filed a suit that was centered on false statements.  "[A] court may infer [sanctionable] intent from a total lack of factual or legal basis for a suit." *Walter v.*

*Fiorenzo*, 840 F.2d 427, 433 (7th Cir. 1988) (citation omitted).  Backpage's counsel forced the Attorney General to respond to two motions for preliminary injunctive relief and forced the Attorney General to fully litigate an appeal (except for oral argument), before withdrawing and abandoning the litigation effort.  Yet this entire lawsuit, from the outset, rested on statements that Backpage's counsel either knew or should have known were false.  This case is much worse than cases where a false statement infects some ancillary matter in litigation.  This entire case would not have existed, but for the false statements central to the complaint.

Moreover, this litigation in Missouri is only part of a long campaign by Backpage's attorneys to defend Backpage from the natural consequences of its appalling illegal behavior.  In its filings in this court, Backpage's counsel repeatedly touted Backpage's legal victories in other cases throughout the country, where they had successfully employed their CDA defense to thwart efforts by law-enforcement authorities and private plaintiffs to hold Backpage accountable for human trafficking.  No doubt Backpage's attorneys profited handsomely in legal fees from these efforts.  But, as Backpage's guilty pleas now demonstrate, all these efforts were premised on the same falsehoods that infected Backpage's litigation here.  And while Backpage's highly compensated attorneys profited handsomely from defending Backpage's conduct for years, underage boys and girls continued to suffer the horrors of commercial sexual exploitation in untold numbers.  Backpage's attorneys should not escape personal responsibility for their actions.  This Court should issue sanctions them.

### III.    In the alternative, this Court should grant leave to expedite a motion for Rule 11 sanctions.

"Rule 11 sanctions may be warranted when a pleading is 'presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation,' Fed. R. Civ. P. 11(b)(1), contains allegations or factual contentions that lack evidentiary support, Fed. R. Civ. P. 11(b)(3), or contains denials of factual contentions that are not warranted on the evidence. Fed. R. Civ. P. 11(b)(4)." *Clark v. United Parcel Serv., Inc*., 460 F.3d 1004, 1008 (8th Cir. 2006).  Even a single false statement in a pleading can justify sanctions. *See Perkins v. Gen. Motors Corp*., 965 F.2d 597, 601 (8th Cir. 1992); *cf. In re Young*, 789 F.3d 872, 875 (8th Cir. 2015) (affirming sanctions imposed on counsel for, among other things, falsely stating that counsel's client was complying with alimony requirements).

For the reasons explained above, Backpage and its counsel engaged in substantial conduct warranting sanctions under Rule 11.  The complaint, two motions for preliminary injunctive relief, and each of the briefs and memoranda Backpage submitted included or relied on false statements.  Although sanctions under Rule 11 are less efficient in this particular case than other sources of authority, sanctions under this rule for each of these filings is appropriate and can encompass all the forms of relief requested above: attorney's fees, a fee payable to the Clerk of the Court, criminal contempt, and a fee payable to a special fund for victims of Backpage in Missouri.

The Attorney General cannot ordinarily move for sanctions under this rule without serving Backpage and its counsel with a motion for sanctions and giving them 21 days to

withdraw the sanctionable filing.  Fed. R. Civ. P. 11(c)(2), (3).  But abiding by that procedural requirement would not serve the administration of justice here.  Backpage and its counsel can no longer correct the harm they created by withdrawing their fraudulent filings, because the case is closed and Backpage's counsel have withdrawn.  *Cooter & Gell*, 496 U.S. at 398 ("Even if [Backpage] quickly dismisses the action, the harm triggering Rule 11's concerns has already occurred.").

For this reason, if the Court declines to impose sanctions under other authority, the Attorney General moves for permission to expedite a motion under Rule 11.  This rule provides that the safe-harbor period lasts 21 days or "another time the court sets."  Fed. R. Civ. P. 11(c)(2).  Because the 21-day period would serve no purpose, this Court should decrease the safe-harbor period from 21 days to zero days, and should deem this motion to be a timely motion for sanctions under Rule 11 as well.  In the alternative, this Court can consider Rule 11 sanctions *sua sponte* without any delay, *see* Fed. R. Civ. P. 11(c)(3).

**RELIEF REQUESTED**

The Attorney General requests that this Court enter an order:

1. requiring Backpage to show cause why it should not be held in criminal contempt;

2. requiring Backpage and its counsel to show cause why civil sanctions should not be imposed against both, including but not limited to orders to:

   a. pay a fee into a restitution fund to be set up for the benefit of the Backpage's victims in Missouri;

24

     b.  pay the Attorney General's fees and costs; and

     c.  compensate this Court for its expenses;

3. permitting supplemental briefing on the amount of sanctions; and

4. providing any other relief this Court deems just and appropriate.


Dated:        July 16, 2018          Respectfully submitted,

                                      **JOSHUA D. HAWLEY**,
                                      Attorney General

                                       _/s/ D. John Sauer_
                                      D. John Sauer, #58721
                                        First Assistant and Solicitor
                                      Joshua Divine, #69875
                                        Deputy Solicitor
                                        Attorney General's Office of Missouri
                                      Post Office Box 899
                                      Jefferson City, MO 65102
                                      Tel: (573) 751-3321
                                      Fax: (573) 751-0774
                                      E-mail: John.Sauer@ago.mo.gov

                                      _Counsel for Defendant_

## CERTIFICATE OF SERVICE

I certify that on July 16, 2018, I electronically filed this document with the Clerk of Court for the Eastern District of Missouri using the CM/ECF system. I also served this document by electronic mail and first-class on the following:

James Condon Grant
DAVIS AND WRIGHT LLP
1201 Third Avenue
Suite 2200
Seattle, WA 98101-3045
206-757-8096
Fax: 206-757-7096
Email: jimgrant@dwt.com

Michael L. Nepple
THOMPSON COBURN, LLP
One US Bank Plaza
505 N. 7th Street
St. Louis, MO 63101
314-552-6149
Fax: 314-552-7149
Email: mnepple@thompsoncoburn.com

Mark Sableman
THOMPSON COBURN, LLP
One US Bank Plaza
505 N. 7th Street
St. Louis, MO 63101
314-552-6103
Fax: 314-552-7103
Email: msableman@thompsoncoburn.com

Robert Edward Miller
DAVIS AND WRIGHT LLP
777 108th AvE. NE
Suite 2300
Bellevue, WA 98004
425-646-6189
Fax: 425-646-6199
Email: robertmiller@dwt.com

Robert Corn-Revere
DAVIS AND WRIGHT LLP
1919 Pennsylvania Ave., NW
Suite 800
Washington, DC 20006-3401
202-973-4200
Fax: 202-973-4499
Email: bobcornrevere@dwt.com

Ronald Gary London
DAVIS AND WRIGHT LLP
1919 Pennsylvania Ave., NW
Suite 800
Washington, DC 20006-3401
202-973-4200
Fax: 202-973-4499
Email: ronnielondon@dwt.com

In addition, I caused a true and correct copy of the foregoing to be served by first-class mail on the last known address of the registered agent for Backpage.com, LLC:

Backpage.com, LLC
Via National Corporate Research, Ltd.
1601 Elm St., Ste. 4360
Dallas, TX 75201

*/s/ D. John Sauer*