**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| BACKPAGE.COM, LLC, Plaintiff, v. JOSHUA D. HAWLEY, in his official capacity as Attorney General of the State of Missouri, Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) )  Case No. 4:17-CV-01951-PLC |

**SUR-REPLY OF NON-PARTY DAVIS WRIGHT TREMAINE LLP
IN OPPOSITION TO DEFENDANT'S MOTION FOR SANCTIONS**

In his Reply Brief filed August 30, 2018 (Doc. 96), Attorney General Hawley contends for the first time that he is entitled to "discovery—including the disclosure of the attorney-client communications between Backpage and its former counsel—to probe whether Backpage's attorneys knew or should have known that their lawsuit was based on false representations." (Reply at 20.) Davis Wright Tremaine LLP ("DWT"), by its counsel, files this Sur-reply to respond to this improper and unwarranted request.[1] The request for discovery is a fishing exhibition and should be denied for five reasons.

First, the premise of Attorney General Hawley's request for discovery is incorrect and misleading. Specifically, the assertion that DWT "conceded" discovery is appropriate with respect to the Motion for Sanctions materially misrepresents DWT's stated position. (*See* Reply 22.) DWT's opposition acknowledged that under Rule 4-1.6(b)(3) of the Missouri Supreme Court Rules, "an attorney may use privileged communications in defense of a claim challenging the

---

[1] Throughout his Reply, the Attorney General misstates the law and misrepresents DWT's positions, but we have limited our Sur-reply to the Attorney General's inappropriate request for discovery.

1

attorney's conduct." (DWT Response at 4 n. 3.) However, contrary to Attorney General Hawley's assertion, DWT did not "concede[] that ordering the disclosure of their attorney-client communications with Backpage would be appropriate to litigate this motion for sanctions." (Reply at 22).[2] DWT explained it was not necessary to use privileged information to respond to the Motion for Sanctions because the motion utterly lacked any factual or legal basis that could support sanctions against DWT.

The fatal deficiencies in the Attorney General's motion cannot be cured by approving a fishing expedition into privileged materials. This is because the Attorney General fails to rebut two dispositive facts: (1) Backpage's lawsuit and challenge to the Attorney General's investigation was directly supported by the First Amendment, immunities prescribed by Section 230 of the Communications Decency Act, 47 U.S.C. § 230, and hundreds of decisions holding that Section 230 preempts state-law civil and criminal claims against websites and publishers based on content created by third parties;[3] and (2) the lawsuit was based on and supported by numerous sworn statements from Mr. Ferrer and Backpage's general counsel. Discovery is unwarranted here because the Attorney General cannot point to any evidence – none – showing that DWT knew or

---

[2] Attorney General Hawley also falsely claims that DWT "conceded" in another suit that "Backpage's privilege waiver is so broad that it removes privilege from anything relevant to that sanctions motion." (Reply at 22.) DWT's filing said no such thing. There too, DWT simply acknowledged that the Illinois Rules of Professional Conduct permit the use of privileged materials in connection with a motion for sanctions against counsel, but demonstrated that there was no need to do so because the record in that case (including the Seventh Circuit's grant of a preliminary injunction in favor of Backpage) amply demonstrated that the sanctions motion was baseless and improper. (Reply Ex. C at 1-2.)

[3] *See Hill v. Stubhub, Inc.*, 727 S.E.2d 550, 558 (N.C. Ct. App. 2012) (noting that as of 2012 there were over 300 reported federal and state court decisions addressing immunity claims advanced under Section 230 and "[a]ll but a handful of these decisions find that the website is entitled to immunity from liability"). As for Attorney General Hawley's claim that no authority supports the supposedly "astonishing assertion that the Attorney General could not even investigate Backpage" (Reply at 17), we refer the Court to *Google, Inc. v. Hood*, 96 F. Supp. 3d 584 (S.D. Miss. 2015), *vacated on other grounds*, 822 F.3d 212 (5th Cir. 2016), in which the district court enjoined an investigation of the Mississippi attorney general targeting third-party content, on the ground that the investigation was barred and preempted by Section 230.

should have known that its clients' averments – made under oath to courts in a half-dozen cases over the span of several years – were not accurate. Instead, the Attorney General relies on unsupported accusations that DWT should have done a more thorough investigation (Reply at 13, 16) and that DWT "knew or should have known" that their lawsuit was based on allegedly false statements (*id.* at 3, 7, 16, 20).[4]

Second, pursuing discovery in the hope of finding something that might cure a defective sanctions motion is unwarranted and subverts the adversarial system. Under the Attorney General's theory, any lawyer would be subject to sanctions if the lawyer relies on his client's sworn statements but the client later changes position. Indeed, the Attorney General's position is that discovery is warranted simply because of allegations made by others. Moreover, the Attorney General's discovery request escalates the threat to the adversarial process by attempting to invade "the most sacred of all legally recognized privileges" merely because Mr. Ferrer's recent pleas contradict his many years' worth of prior sworn statements. *See Halbach v. Great-W. Life & Annuity Ins. Co.*, No. 405CV2399 ERW, 2006 WL 3803696, at *4 (E.D. Mo. Nov. 21, 2006). As explained before, such plea agreements are inherently suspect and unreliable. *United States v. Vera*, No. 16-50364, 2018 WL 3097956, at * 3 (9th Cir. June 25, 2018). The Attorney General cannot simply file a baseless motion for sanctions that fails to make a prima facie showing and then seek discovery in the hope he will find something that supports his allegations. If that were the case, every criminal defense lawyer whose client ultimately pleads guilty or loses a trial would

---

[4] The Attorney General attempts to manufacture another new issue on reply by asserting that "Backpage's counsel do not even try to defend against one of the grounds for sanctions," *i.e.*, that "[t]he Attorney General investigated Backpage in part to determine whether Backpage misrepresented itself to credit card companies." (Reply at 8.) However, the Attorney General's CID had nothing to do with Backpage's dealings with credit card companies or processors (*see* Doc. 1-1), and instead entirely concerned Backpage's publication of and practices relating to third-party ads for "sexually oriented services" (*id.*).

3

be subject to sanctions and to an after-the-fact review of their representation by the prosecutor that includes a review of privileged communications.[5]

Third, Attorney General Hawley is not entitled to any discovery as a matter of law. Courts generally "limit the scope of sanctions proceedings to the record and allow discovery only in extraordinary circumstances." *Indianapolis Colts v. Mayor & City Council of Baltimore*, 775 F.2d 177, 183 (7th Cir. 1985) (citing Fed. R. Civ. P. 11 advisory committee's note (1983)) (denying defendant's request for remand to the district court for discovery related to Rule 11 and section 1927 claims); *Arctic Cat, Inc. v. Bombardier Recreational Prod., Inc.*, No. 12-CV-2692 (JRT/LIB), 2014 WL 12599608, at *6 (D. Minn. Sept. 19, 2014) (denying discovery for Rule 11 sanctions motion absent the required showing of extraordinary circumstances); *In re Central ice Cream Co.*, No. 85 C 10073, 1986 WL 13635, at *6 (N.D. Ill. Nov. 21, 1986) (recognizing that the court must limit the scope of sanctions proceedings under section 1927, Rule 11, and the court's inherent authority to the record and only grant leave for additional discovery in extraordinary circumstances). As in his opening motion, the Attorney General fails to state the applicable standard, and he comes nowhere close to satisfying it – there are no "extraordinary circumstances" warranting discovery here.

Fourth, the cases cited by Attorney General Hawley in support of his improper and belated sanctions discovery requests are inapposite and readily distinguishable.[6] Attorney General

---

[5] Moreover, Attorney General Hawley improperly implies that he is entitled to any privileged materials concerning DWT's representation of Backpage. (*See* Reply at 21.) In fact, however, privilege rights were and are held by other parties, including pursuant to joint representation agreements whereby DWT represented numerous Backpage-related parties. Mr. Ferrer cannot unilaterally waive these privileges.

[6] Three of the decisions that the Attorney General relies upon are irrelevant to his discovery request in a sanctions proceeding. *See Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726 (8th Cir. 2002) (discovery permitted where Nebraska law recognized implicit waiver of privileges to determine reasonableness of indemnification demand); *Brown v. Hart, Schaffner & Marx*, 96 F.R.D. 64, 66 (N.D. Ill. 1982) (Rule 23.1's

4

Hawley cites only one decision, *A.B.S. v. Board of Police Commissioners,* No. 4:12-cv-00202-JCH, (E.D. Mo.), Doc. 104 (Reply Ex. D), 140 (Reply Ex. E), where discovery was permitted in satellite sanctions litigation, and that case does nothing to support his motion. (*See* Reply Exs. D, E.)  In *A.B.S.*, the court reopened limited discovery to determine whether the Missouri Attorney General's office violated the court's discovery orders by improperly withholding DNA reports. (See Reply Ex. D.)  The court's decision was triggered by the Attorney General's release of an investigative report confirming that the Missouri Attorney General's Office was aware of and failed to turn over the DNA reports in discovery.  (*See* Exhibit 1.)  The Attorney General cannot equate the admissions of improper conduct in *A.B.S.* to his unsupported accusations against DWT here.  To the contrary, the Attorney General seeks discovery in an after-the-fact attempt to bolster the unsupported assertions in his motion for sanctions.  Courts have cautioned that sanctions litigation ought not turn into satellite litigation.  *Robertson v. Cartinhour*, 883 F. Supp. 2d 121, 131 n. 31 (D.D.C. 2012), *aff'd*, 554 F. App'x 3 (D.C. Cir. 2014).

Fifth, the Attorney General waived the request for discovery in connection with his motion for sanctions because it was raised for the first time in his Reply.  *Mills v. St. Louis Cty. Gov't*, No. 4:17cv0257 PLC, 2018 WL 2117656, at *4 n.2 (E.D. Mo. May 8, 2018) (Cohen, J.) ("Because Plaintiff raised these arguments for the first time in a reply brief, they are not properly before the Court."); *accord Robinson v. City of St. Louis*, No. 4:17-CV-156 PLC, 2018 WL 1695534, at *14 n.11 (E.D. Mo. Apr. 6, 2018) (Cohen, J.); *Jones v. Slay*, 61 F. Supp. 3d 806, 823 n.5 (E.D. Mo. 2014) (noting that waiting to offer arguments and supporting authorities in a reply memorandum "smacks of sandbagging").

---

requirement for the verification of derivative actions permitted limited discovery where plaintiff had verified her complaint without "having even the vaguest notion of whether or not a factual basis existed," but did not permit discovery of attorney client communications); *Cascone v. Niles Home for Children*, 897 F. Supp. 1263 (W.D. Mo. 1995) (deposition of employer's attorney limited to non-privileged information).

Attorney General Hawley's belated request for discovery coupled with his inability to demonstrate any circumstances to justify discovery – much less anything approaching "extraordinary circumstances" – underscores the absence of bad faith or any objective unreasonableness, and ultimately the futility of this Motion for Sanctions, which should be denied in its entirety.

Dated:  September 7, 2018.                                        Respectfully submitted,

                                                                   By: */s/ Jeffrey D. Colman*
                                                                   Jeffrey D. Colman, 0491160IL
                                                                      (*Pro Hac Vice*)
                                                                   John R. Storino, 6273115IL
                                                                      (*Pro Hac Vice*)
                                                                   LaRue L. Robinson, MO – 67261
                                                                   JENNER & BLOCK LLP
                                                                   353 N. CLARK STREET
                                                                   CHICAGO, IL 60654-3456
                                                                   +1 312 222 9350 (Telephone)
                                                                   +1 312 527 0484 (Facsimile)
                                                                   lrobinson@jenner.com
                                                                   jcolman@jenner.com
                                                                   jstorino@jenner.com

                                                                   Robert T. Haar #30044MO
                                                                   Lisa A. Pake #39397MO
                                                                   HAAR & WOODS, LLP
                                                                   1010 Market St., Suite 1620
                                                                   St. Louis, MO 63101
                                                                   314-241-2224 (Telephone)
                                                                   314-241-2227 (Facsimile)
                                                                   roberthaar@haar-woods.com
                                                                   lpake@haar-woods.com

                                                                   Attorneys for Non-Party Respondent Davis Wright Tremaine LLP

# Exhibit 1



# REPORT TO THE
# MISSOURI ATTORNEY GENERAL

One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102-2750

# REPORT TO THE MISSOURI ATTORNEY GENERAL[1]

## 1. INTRODUCTION

On September 18, 2017, attorney Albert Watkins, of the law firm Kodner Watkins, LC, wrote to the Missouri Attorney General's Office ("AGO"), in his capacity as attorney for Autumn Smith, the surviving minor child of Anthony Lamar Smith. Watkins previously filed a federal civil rights lawsuit during February, 2012 on behalf of Autumn Smith, and against the St. Louis Metropolitan Police Board of Commissioners ("the Board") and former St. Louis Metropolitan Police Department ("SLMPD") Officer Jason Stockley. That lawsuit stemmed from the December 20, 2011 police officer involved shooting and death of Anthony Lamar Smith. The AGO represented the Board and former Officer Stockley in that lawsuit. During a June 20, 2013 Mediation proceeding, the federal civil lawsuit was settled between the parties. In his September 18, 2017 letter, Watkins raised various allegations, primarily that the AGO had failed to produce two specific items of evidence to him prior to the June 20, 2013 Mediation and settlement of the lawsuit: Evidence which reflected that only former Officer Stockley's DNA was found on the revolver seized from Anthony Lamar Smith's vehicle, and a video recording purportedly made by a citizen in the area of the December 20, 2011 shooting incident. Mr. Watkins raised similar allegations with the AGO in a June 22, 2016 letter, and in his September 18, 2017 letter he voiced the additional concern that the AGO had been less than responsive to his prior June 2016 letter. On September 28, 2017, the AGO retained the law firm of Bryan Cave, LLP to conduct an independent investigation to determine the facts and circumstances relating to the allegations raised by attorney Watkins in his June 22, 2016 and September 18, 2017 letters.

Hal Goldsmith is the lead attorney tasked with conducting this investigation, along with other Bryan Cave attorneys. Mr. Goldsmith joined Bryan Cave during May, 2015, and is a Partner in the firm's St. Louis office. Prior to joining the law firm, Mr. Goldsmith was employed by the United States Department of Justice, serving as an Assistant United States Attorney in St. Louis, Missouri, East St. Louis, Illinois, and Miami, Florida. He has over 20 years' experience as a federal prosecutor, and served in both St. Louis and East St. Louis as the chief prosecutor for public corruption investigations and prosecutions in those two Offices. He served in various supervisory roles, including chief of the criminal division, senior litigation counsel, and chief of the white collar section. His current practice focuses on white collar criminal defense, internal investigations, complex commercial litigation, and regulatory enforcement as a member of the firm's White Collar Defense and Investigations Group. Shelby Hewerdine, another of the attorneys tasked with conducting this investigation, is an Associate and the Concordance Academy Fellow, having joined Bryan Cave during 2016. She is a 2016 graduate of the St.

---

[1] This Report has been carefully edited to remove privileged and client-confidential information. A complete Report of the investigation has been provided to the Attorney General's Office, containing a detailed account of interviews and information obtained during this investigation, but the complete Report cannot be publicly disclosed without a waiver of privilege and confidentiality by the AGO's former clients, the Board and Officer Stockley. As of the date of this Report, these waivers have been requested, but they have not been received.

Louis University School of Law, *summa cum laude,* and practices primarily in the area of commercial litigation.

Bryan Cave has been engaged solely to determine the underlying facts and circumstances presented in these matters, and has not been requested to offer any opinions as to those facts, or make any recommendations as to action that might be appropriate based upon the facts uncovered. Bryan Cave has conducted those interviews and reviewed those records it has determined to be necessary and pertinent to the Attorney General's directive. This Report addresses matters relating to the conduct of litigation in the civil lawsuit brought by Mr. Smith's survivors against the Board and Officer Stockley. It does not address any matters relating to the criminal prosecution of Officer Stockley arising from the shooting incident.

To conduct this investigation, Bryan Cave attorneys reviewed pertinent records, including AGO files, SLMPD files, email communications of AGO personnel, District Court files, and the files of Plaintiff's attorneys. Bryan Cave attorneys interviewed numerous witnesses, including Plaintiff's attorney, the former Assistant Attorney General who defended the Board and Officer Stockley during the civil case, two other Assistant Attorneys General involved in the case, the attorney for the Board, the lead SLMPD investigator for the shooting incident involving Officer Stockley, the former SLMPD Inspector of Police, the former interim City Counselor, and former Officer Stockley's criminal defense attorney. A detailed report of the results of these interviews and review of records has been provided to the Attorney General's Office as part of this investigation.

## 2. DECEMBER 20, 2011 INCIDENT

On December 20, 2011, an incident occurred in the City of St. Louis where Anthony Lamar Smith was shot and killed by former SLMPD Officer Jason Stockley. In brief, Officer Stockley and his partner reported to have observed Smith involved in a drug deal and attempted to stop Smith in his vehicle as he fled from the Officers. During that initial incident, the Officers reportedly saw Smith in possession of a silver handgun. Following a pursuit, the officers rammed their vehicle into Smith's causing Smith's vehicle to stop, and engaging the front and side airbags in Smith's vehicle. Officer Stockley fired five (5) shots at close range at Smith after observing what Stockley later reported as Smith reaching for what Stockley believed to be a firearm in the vehicle. Following the shooting and removal of Smith's body from the vehicle, Officer Stockley reported to have entered the driver's area of the vehicle, searched for and retrieved a silver in color Taurus revolver from an area next to Smith's front driver's seat. Anthony Lamar Smith left a surviving daughter, Autumn Smith.

## 3. INVESTIGATIONS

As is publicly known, following the December 20, 2011 shooting incident, the SLMPD Internal Affairs Division initiated an investigation into former Officer Stockley's conduct.

Shortly thereafter, the Federal Bureau of Investigation commenced its own civil rights investigation of the shooting.

### A. The DNA Evidence

As became publicly known during the criminal trial of Jason Stockely, and through media reporting, and of significance for this Report, immediately following the December 20, 2011 shooting incident, SLMPD Firearms Examiner David Menendez took and preserved swabs from the trigger, grip and rough areas of the recovered and seized Taurus revolver for later processing for the possible existence of DNA evidence. DNA samples were also obtained from Jason Stockley and the decedent, Anthony Lamar Smith, for comparison purposes. As Firearms Examiner Menendez reported in a December 22, 2011 Laboratory Report, the DNA evidence was properly preserved within the SLMPD evidence room freezer for later testing.

In a Laboratory Report dated February 14, 2012, SLMPD Laboratory Technician, Dr. Karen Preiter, described her analysis of the DNA swabs obtained from the Taurus revolver. Dr. Preiter determined and concluded that Jason Stockley's DNA was the only identifiable DNA evidence contained on the swab taken from the trigger, grip and rough areas of the Taurus revolver.

During June, 2012, an additional swab was taken from the head of a screw located on the Taurus revolver and preserved for later processing for the possible existence of DNA evidence. In a Laboratory Report dated July 31, 2012, SLMPD Laboratory Technician, Dr. Karen Preiter, described her July 12, 2012 analysis of the DNA swab obtained from the screw on the Taurus revolver. Dr. Preiter determined and concluded that Jason Stockley's DNA was the only identifiable DNA evidence contained on the swab taken from the screw on the Taurus revolver.

### B. The Civilian Video Recording

In sworn testimony on May 1, 2017, in relation to the state criminal case against Jason Stockley, A.F., the owner of the nightclub located next to the scene of the December 20, 2011 shooting, admitted that he had recorded the video of the December 20, 2011 incident. A.F. further testified that shortly after the December 20, 2011 incident, he provided a copy of the video to a family member. Sometime later, during 2016, he was contacted by community activist Anthony Shahid who had learned of the video from the family member, and wanted A.F.'s permission to make the video public. A.F. consented, as long as his name was not used. On June 3, 2016, a story authored by reporter Christine Byers was published in the St. Louis Post Dispatch, and the video recording was included in that story. According to that story, the video recording was provided to a Post Dispatch reporter "by the Reverend Phillip Duvall, who is associated with Anthony Shahid and other activists...."

### 4. THE FEDERAL CIVIL LAWSUIT

On February 6, 2012, a civil lawsuit was filed in the United States District Court in St. Louis, Missouri on behalf of the surviving child, Autumn Smith, and against the Board and former SLMPD Officer Jason Stockley. Attorney Albert Watkins and the law firm of Kodner

Page 4

Watkins brought that lawsuit on behalf of the Plaintiff, Autumn Smith. The AGO represented the Board and Stockley in the defense of that lawsuit. A senior Assistant Attorney General ("AAG 1") was assigned as the lead defense attorney. The lawsuit raised allegations of federal civil rights violations as well as wrongful death against the Board and Stockley related to the December 20, 2011 shooting death of Anthony Lamar Smith. The case was assigned to United States District Court Judge Jean Hamilton.

For purposes of this Report, it should be noted that, while not specifically set forth in the formal civil complaint, it was the theory and position of the Plaintiff that former SLMPD officer Stockley had "planted" the Taurus revolver in Anthony Lamar Smith's vehicle after Stockley shot and killed him in order to justify the shooting death of Smith.

### A. Discovery in the Federal Civil Lawsuit

In her May 15, 2012 Case Management Order, Judge Hamilton ordered all discovery to be completed by May 15, 2013. She also ordered the case referred for Mediation to be completed by June 15, 2013 and, if necessary, Trial was scheduled for August 5, 2013.

On July 5, 2012, the Plaintiff served her first Request for Production of Documents on Defendants. Among other things, Plaintiff requested:

> All copies and drafts of written police reports, investigative reports, computer media and written memoranda with regard to the fact situation giving rise to the instant litigation.

> All audio and/or visual recordings, including but not limited to, … evidentiary video recordings collected and/or maintained by Defendants memorializing the fact situation giving rise to the instant litigation and/or any investigation thereof.

On July 5, 2012, the Plaintiff also served her first Interrogatories on Defendants. Among other things, Plaintiff inquired:

> Was an investigation into the subject shooting conducted?
>
> …
>
> Produce a copy of all materials, written or otherwise, generated as a result of this investigation….

During August, 2012, Defendants responded to Plaintiff's Requests for Production of Documents, and Plaintiff's Interrogatories. While Defendants produced some limited responsive materials, Defendants advised the Plaintiff that, "An investigation by the Internal Affairs Division is being conducted and is ongoing." "To the extent any additional items responsive to this request exist, such items are now held as evidence, under the custody of the Internal Affairs Division, while the internal investigation is conducted. Defendants will timely supplement." Within the materials produced to Plaintiff, Defendants did not produce Firearms Examiner Menendez' December 22, 2011 Laboratory Report reflecting that DNA swabs of the Taurus revolver had been taken. Nor did Defendants produce Dr. Preiter's February 14, 2012 or July 31,

2012 Laboratory Reports which reflected that former SLMPD Officer Stockley's DNA was the only identifiable DNA evidence located and identified on the Taurus revolver.

When interviewed by Bryan Cave attorneys during this Investigation, attorneys for Plaintiff advised that, following receipt of the August, 2012 discovery materials from the AGO, the parties informally stayed the federal civil lawsuit while the FBI and IAD investigations were ongoing. Attorneys for Plaintiff further advised that, during November, 2012, they met with the United States Attorney who advised them that the FBI investigation was finished, and that his Office would not be bringing criminal charges against former SLMPD Officer Stockley.

On January 2, 2013, Plaintiff's attorney sent a letter to AAG 1 requesting that the AGO produce all records, materials and information which Plaintiff had previously requested on July 5, 2012. Plaintiff's attorney also raised a question of the status of the IAD investigation.

On January 10, 2013, the AGO produced some additional records and materials to Plaintiff. However, the AGO again advised: "To the extent any additional items responsive to this request exist, such items are now held as evidence, under the custody of the Internal Affairs Division, while the internal investigation is conducted. Defendants will timely supplement." Within the additional materials produced to Plaintiff, Defendants did not produce Firearms Examiner Menendez' December 22, 2011 Laboratory Report reflecting that DNA swabs of the Taurus revolver had been taken. Nor did Defendants produce Dr. Preiter's February 14, 2012 or July 31, 2012 Laboratory Reports which reflected that former SLMPD Officer Stockley's DNA was the only identifiable DNA evidence located and identified on the Taurus revolver.

On January 28, 2013, Plaintiff filed her Motion to Compel Discovery. In her Motion, Plaintiff raised the issue that Defendants had not produced records, materials and information purportedly held by IAD.

On January 31, 2013, Defendants produced additional records to Plaintiff. Within these additional materials produced to Plaintiff, Defendants did not produce Firearms Examiner Menendez' December 22, 2011 Laboratory Report reflecting that DNA swabs of the Taurus revolver had been taken. Nor did Defendants produce Dr. Preiter's February 14, 2012 or July 31, 2012 Laboratory Reports which reflected that former SLMPD Officer Stockley's DNA was the only identifiable DNA evidence located and identified on the Taurus revolver.

On February 15, 2013, Plaintiff issued her Second Request for Production of Documents to Defendants. Among other things, Plaintiff requested:

> All documents, reports, and photographs created by and for the Defendants as a part of their investigation into the incident giving rise to the instant litigation, including but not limited to, photographs of the scene and evidence taken therefrom,...

On March 1, 2013, Judge Hamilton conducted a hearing on Plaintiff's Motion to Compel. Attorney Watkins appeared for Plaintiff, and AAG 1 appeared for Defendants. During this hearing, AAG 1 advised the Court that, "The FBI then decided that they weren't going to prosecute on the case. They did in fact turn everything back over to IAD...." After hearing

argument from the attorneys, Judge Hamilton ordered Defendants to produce all records and materials related to the IAD investigation as well as the FBI investigation to the Plaintiff.

On March 4, 2013, a second Assistant Attorney General entered their appearance as co-counsel on behalf of Defendants, ("AAG 2"), in order to work along with AAG 1.

On April 9, 2013, Defendants filed two Motions for Protective Orders regarding the production of records and materials from the IAD file to Plaintiff. In their Motions, Defendants noted:

> In compliance with the Court's [March 1, 2013] order, Defendants are required to produce confidential documentation and documentation that has been gathered and is currently being gathered subject to an IAD and or FBI investigation.
>
> Due to the pending internal investigation and the potential criminal charges and confidential nature of such information, Defendants' counsel is requesting that production of responsive documents, CDs and DVDs be under a protective order.

On April 10, 2013, the AGO produced records and materials from the SLMPD IAD file to Plaintiff in response to Plaintiff's Requests for Production. Of significance is the fact that contained within this production of records was SLMPD Firearms Examiner Menendez' December 22, 2011 Laboratory Report reflecting that swabs were taken of the seized Taurus revolver for later DNA testing. However, Defendants did not produce Dr. Preiter's February 14, 2012 or July 31, 2012 Laboratory Reports which reflected that former SLMPD Officer Stockley's DNA was the only identifiable DNA evidence located and identified on the Taurus revolver.

On April 12, 2013, Defendants produced additional records to Plaintiff in response to Plaintiff's Request for Production. Again, Defendants did not produce Dr. Preiter's February 14, 2012 or July 31, 2012 Laboratory Reports which reflected that former SLMPD Officer Stockley's DNA was the only identifiable DNA evidence located and identified on the Taurus revolver. Aside from the SLMPD firearms policy which was produced on June 12, 2013, this was the last production of records and materials by Defendants to Plaintiff.

### B. The Mediation

On April 15, 2013, Judge Hamilton ordered the civil lawsuit to Mediation, to be completed by June 15, 2013, pursuant to her original May 5, 2012 Order.

On May 9, 2013, Defendants filed their Motion to Amend Case Management Order, requesting that the Mediation deadline be extended until June 21, 2013, "[t]o allow counsel the ability to meet and confer with her clients to ensure a thorough evaluation of the matter in preparation for mediation." The Court granted this Motion, and extended the deadline to complete Mediation to June 21, 2013.

During June, 2013, Plaintiff's attorneys scheduled depositions of various SLMPD witnesses, including the SLMPD Inspector of Police. On June 12, 2013, AAG 1 advised Plaintiff's attorneys that a different Assistant Attorney General ("AAG 3") would be entering the case in order to defend Stockley, and that AAG 1 and AAG 2 would continue to defend the Board. "…in preparing for depositions of this case I have developed a direct conflict as it relates to Jason Stockley."

In reviewing the AGO files related to this matter, there are no notes or memoranda reflecting the basis for AAG 1's conclusion that a conflict existed in her continued representation of both the Board and Stockley.

On June 14, 2013, AAG 3 formally entered an appearance in the civil lawsuit on behalf of Stockley. AAG 1 and AAG 2 continued to represent the Board.

According to statements made to Bryan Cave attorneys during their interviews as part of this investigation, Plaintiff's attorneys had reviewed the December 22, 2011 Menendez Laboratory Report produced to them on April 10, 2013, they had seen that DNA swabs were taken from the Taurus revolver, and they had asked AAG 1 on two separate occasions whether the subsequent testing had resulted in any DNA evidence being identified. According to Plaintiff's attorneys, AAG 1 had responded to their questions by advising that no DNA evidence had been recovered or identified from the Taurus revolver. On June 18, 2013, two days before the scheduled June 20, 2013 Mediation, Plaintiff's attorneys spoke with AAG 1 one last time concerning their discovery requests, and were advised that there were no additional records or materials to be provided to them. During our investigation, we found no documentation concerning these reported discussions, either in the Plaintiff's attorney's files, or in the AGO files.

It is clear from our investigation that AAG 1 was aware, *prior to the June 20, 2013 Mediation conference*, of the DNA lab test results reflecting Stockley's DNA having been recovered from the Taurus revolver, and that these DNA lab test results were not produced to the Plaintiff in discovery.

During the Mediation proceeding on June 20, 2013, AAG 1 and the Board's attorney represented the Defendant Board, and Albert Watkins represented Plaintiff. AAG 3 also attended a portion of the Mediation as counsel for Defendant Stockley. According to Plaintiff's attorney, there was no mention by AAG 1 or the Board's attorney of the DNA evidence during the Mediation joint sessions. In her Mediation Statement, and during the Mediation, one of the theories put forth by Plaintiff continued to be that the Taurus revolver was planted in Anthony Lamar Smith's vehicle by SLMPD Officers, including Defendant Stockley, to justify the shooting and killing of Smith. However, Plaintiff's counsel did not argue the fact that Stockley's DNA was recovered from the Taurus revolver, as that information and evidence had not been

disclosed to him by the AGO. As a result of the Mediation, Defendants agreed to pay Plaintiff $900,000 in full settlement of the civil lawsuit.

## 5. MATTERS OCCURRING DURING 2016

On May 16, 2016, former SLMPD Officer Stockley was arrested in Texas on a Criminal Complaint of Murder issued by the Circuit Attorney's Office for the City of St. Louis ("CAO"). The Murder charge related to the December 20, 2011 shooting death of Anthony Lamar Smith. Shortly after this arrest, it was widely reported in the St. Louis media that the Circuit Attorney had disclosed that Stockley's DNA had been found on the seized Taurus revolver, while the decedent, Anthony Lamar Smiths' DNA was not recovered from the revolver. The Circuit Attorney's Office disclosed that the DNA evidence had been identified during 2012.

On May 17, 2016, a reporter with the St. Louis Riverfront Times newspaper sent an inquiry to the AGO's Press Secretary concerning the long settled federal civil lawsuit: "I spoke this morning to attorney Albert Watkins…and he now suspects DNA evidence was withheld during that case. I'm curious if the [AGO] attorneys handling the case knew of any DNA evidence or analysis. If they did, why wasn't it disclosed to the plaintiffs?"

On May 18, 2016, the reporter with the St. Louis Riverfront Times questioned the AGO Press Secretary further: "In addition to Watkins, U.S. Attorney Richard Callahan says the DNA evidence would've been available in early 2012. If no one in AG's office was aware it existed, I'd be curious to know why." The AGO Press Secretary responded to the Riverfront Times Reporter on behalf of the AGO: "…to our office's knowledge, no DNA evidence was available." There was no mention in this response that the lead AAG had been aware of the DNA test result information prior to the June 20, 2013 Mediation.

Also on May 18, 2016, a reporter with the St. Louis Post Dispatch addressed a similar inquiry to the AGO Press Secretary, and advised that, "we know that DNA was available because it was complete in June, 2012."

On May 31, 2016, the St. Louis Post Dispatch reporter advised the AGO Press Secretary that, "[reporter] Christine [Byers] says…Bruntrager said in open court today that a second DNA test was conducted in July 2012…gun contained Stockley's DNA but not Smith's." Attorney Neil Bruntrager was Stockley's criminal defense attorney.

On June 22, 2016, Albert Watkins wrote to the City Counselor's Office raising the issue of the AGO's failure to turn over the DNA evidence:

> In one of the internal reports produced as part of the disclosed discovery, it was noted that the silver handgun Defendant Stockley alleged he recovered from Mr. Smith's car was processed for DNA evidence. Despite our requests, no results were present as part of the discovery produced by your office. When we inquired, Defendants' counsel told us there was no DNA evidence found on the gun.

Attorney Watkins also noted in his letter the Circuit Attorney's recent disclosures that DNA testing from 2012 identified Stockley's DNA as the only DNA evidence recovered from the Taurus revolver.

In his June 22, 2016 letter, Watkins also raised the allegation that during the discovery phase of the federal civil lawsuit, and prior to the Mediation, the AGO had failed to provide him with a copy of the citizen recorded video from December 20, 2011. It should be noted, however, that it appears clear from our investigation that the video recording did not come into possession of law enforcement until June, 2016, when the St. Louis Post Dispatch disclosed it.

On June 23, 2016, a reporter for the St. Louis Post Dispatch inquired further of the AGO Press Secretary concerning the DNA evidence, " I'm working on a story about Al Watkins asking the city counselor's office and the Attorney General's Office to reopen the civil litigation involving Jason Stockley. He says that he was never given a copy of the DNA reports or the cellphone video and the failure to disclose such evidence is grounds to reopen the case. I wanted to know if your office would have a response to his letter as well as ask whether you all knew of the DNA evidence...." The Press Secretary responded to the reporter on behalf of the AGO, "We thoroughly reviewed our case file, and we found no indication that the AGO ever received a DNA report analyzing the handgun. Our records indicate that we gave every report and video in our possession to Plaintiffs' counsel." There was no mention in this response that the AGO had been aware of the DNA test result evidence prior to the June 20, 2013 Mediation.

On June 28, 2016, a senior member of the AGO, ("AAG 4"), responded to Albert Watkins' letter. In that letter, AAG 4 acknowledged Watkins' allegation that the AGO failed to produce the DNA test results and the civilian video recording. AAG 4 went on to state, "Our Office has thoroughly reviewed our entire file. As we have previously stated, every report and every video in possession of the Attorney General's office was produced to you and your firm as part of the discovery process. In this regard, your file and our office's file contained the same information." AAG 4 made no mention in this response that the AGO possessed the DNA test result information prior to the June 20, 2013 Mediation and settlement.

### 6. CONCLUSION

Having interviewed those persons who were in a position to have information relevant to the Plaintiff's allegations, and reviewed pertinent records, we can draw certain conclusions from the facts uncovered.

First, there does not appear to be any evidence that the AGO or the SLMPD had possession of, or knew of the existence of the December 20, 2011 civilian recorded video until it was first published by the Post Dispatch on June 3, 2016. Thus, the facts do not seem to support Plaintiff's allegation that the AGO improperly withheld such information during the discovery phase of the federal civil lawsuit. From our investigation, it appears that all known audio and video recordings were properly provided to Plaintiff prior to the June 20, 2013 Mediation and settlement, including the SLMPD vehicle recordings and the OnStar audio recording from the decedent's rental car.

Second, as to the laboratory evidence identifying former SLMPD Jason Stockley's DNA on the Taurus revolver, and based upon the facts learned during our investigation, it does appear that the AGO was aware of and failed to turn over that information to the Plaintiff prior to the June 20, 2013 Mediation and settlement. Plaintiff's formal discovery requests served upon Defendants, both the Requests for Production of Documents and the Interrogatories, were broad enough to require the pertinent DNA test result information to be produced during discovery. U.S. District Court Judge Hamilton's March 1, 2013 Order required Defendants to produce the entire SLMPD IAD and the FBI files to Plaintiff. The DNA test result information should have been produced pursuant to that Court's Order and Plaintiff's discovery requests. On April 10, 2013, Defendants did produce to Plaintiff a copy of SLMPD Firearms Examiner Menendez' December 22, 2011 written Report where he documented that swabs were taken of the Taurus revolver and preserved for DNA testing. The SLMPD Laboratory Technician Dr. Karen Preiter analyzed the DNA recovered from those swabs, compared it to the known DNA of the decedent Anthony Lamar Smith and former SLMPD Officer Stockley, and concluded in her February 14, 2012 written Report that Stockley's DNA was recovered from the revolver, while the decedent's DNA was not present on the revolver. Additional DNA evidence was recovered from a screw head on the Taurus revolver during June, 2012, analyzed by Dr. Preiter and, as documented in her July 31, 2012 written Report, again identified as the DNA of Stockley, while the decedent's DNA was not identified. Neither of Dr. Preiter's written Laboratory Reports was produced to Plaintiff in discovery prior to the June 20, 2013 Mediation and settlement. The facts learned during our investigation establish that the AGO, through at least one AAG, was aware of the DNA laboratory test result information prior to the June 20, 2013 Mediation and settlement, as were many agents of the Board. While it is clear that the AGO failed to produce the known DNA test results to Plaintiff, it is not clear from our investigation why that information was not produced. It remains unknown whether Dr. Preiter's written Laboratory Reports were simply inadvertently left out of the files provided by SLMPD to the AGO for production to Plaintiff, or whether they were intentionally withheld from production by either the SLMPD or the AGO. The pertinent Laboratory Reports were not contained within the AGO's files when we reviewed them during our investigation. It should be noted that, along with other records and materials contained within the SLMPD files related to the December 20, 2011 shooting incident, Officer Menendez' and Dr. Preiter's written Laboratory Reports concerning the DNA evidence were provided by SLMPD to both the Circuit Attorney's Office and the United States Attorney's Office during 2012.

Finally, we reviewed Plaintiff's allegation that the AGO's June 28, 2016 letter, in response to Plaintiff's counsel's June 22, 2016 inquiry concerning the DNA testing results and video recording, was intentionally non-responsive. While the AGO's response letter was factually accurate in advising Plaintiff's counsel that the AGO's file contained no "report" concerning DNA testing which was not produced to Plaintiff during discovery, it failed to advise Plaintiff's counsel that at least one AAG, the lead AAG, was in fact aware of the DNA testing results prior to the June 20, 2013 Mediation and settlement.

# # # # #